[Civ. No. 20979. Third Dist. Mar. 24, 1983.]

VERA A. HEADEN et al., Plaintiffs and Appellants, v.
ETHEL I. MILLER, Defendant and Respondent.

**COUNSEL**

Thomas W. Martin, James R. Martin and Leroy Y. Fong for Plaintiffs and Appellants.

Hefner, Stark & Marois, Judy R. Campos and James M. Woodside for Defendant and Respondent.

OPINION

CARR, J.—In this appeal from a judgment of dismissal entered after the trial court sustained without leave to amend demurrers by defendant Ethel I. Miller to all 17 causes of action alleged in the complaint, the parties, by admission and briefing have limited the appeal to the 10th, 11th, 12th and 13th causes of action.[1] Stripped to the essentials, these causes of action allege that a fraudulent conveyance, void as to plaintiff creditors, occurred when defendant Miller's now deceased husband changed the beneficiary on certain insurance policies on his life from his partner in their real estate business to his wife, defendant herein, a few months prior to his death. Plaintiffs, creditors of the partnership, seek to satisfy their claims from such insurance proceeds.

A demurrer admits all material and issuable facts properly pleaded. (*Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) The facts, as alleged in the complaint, are that Ben Miller and Tom Oden were partners in a real estate venture known as Pioneer Realty Company (Pioneer). The plaintiff Wongs loaned Miller as an agent of Pioneer $180,700 and the Headens assigned him as an agent of Pioneer a promissory note to be used for land development and investment purposes. Miller and Oden maintained life insurance policies[2] on each other's lives with the premiums paid by Pioneer. Such policies are alleged to be assets of the partnership. The policy on Miller's life named Oden as beneficiary. Approximately three months prior to his death Miller changed the beneficiary on his policy from Oden to his wife, defendant Ethel Miller. At the time of this change of beneficiary, both Miller and Pioneer were in debt to the point of insolvency. The monies obtained from plaintiffs were not used for real estate investment but to pay the business and personal obligations of Pioneer, Miller and Oden.

In the fall of 1979, Miller and Pioneer defaulted on the obligations to all plaintiffs and on November 28, 1979, Miller died in an automobile accident. Prior to his death, Miller had sold the Headens' note without their consent. Plaintiffs submitted claims to decedent Miller's estate. These were denied except for $44,489.24 allowed the Headens.

---

[1] In explanation (and perhaps exoneration) of the trial judges participating in these extended proceedings, we note Judge Babich made the order sustaining the demurrer to the 10th, 11th, 12th and 13th causes of action, at issue herein. Judge Gualco sustained the demurrers to the remaining causes of action, not at issue herein, and Judge Marler, presumably as the presiding judge in the absence of the other judges, signed the order of dismissal.

[2] For the sake of convenience, this unknown number of policies will hereafter be referred to in the singular.

The causes of action against defendant Miller were premised upon her receipt of the life insurance proceeds as fraudulent transfers.[3] The trial court in sustaining the demurrers without leave to amend for failure to state a cause of action cited, without comment, *Bryson v. Manhart* (1936) 11 Cal.App.2d 691 [54 P.2d 778], and *Union Central Life Ins. Co. v. Flicker* (9th Cir. 1939) 101 F.2d 857. By such citation, inferentially the court held the transfer was not in fraud of creditors as the beneficiary before the transfer was not the estate of deceased policy holder (*Bryson v. Manhart, supra,* 11 Cal.App.2d 691) and, in any event, the transfer was fraudulent only as to the cash surrender value of the insurance policy at the time of transfer. (*Union Central Life Ins. Co. v. Flicker, supra,* 101 F.2d 857.)

We do not perceive the problem to be so simple of solution. There is a paucity of case law, both in California and other jurisdictions on the issue of whether a change of beneficiary on a life insurance policy is properly the basis of a fraudulent conveyance action, and, if so, the measure of damages.

For reasons set forth we conclude the trial court erred in determining plaintiffs failed to state a cause of action.

I

The general rule in California and other jurisdictions which have adopted the Uniform Fraudulent Conveyance Act is that a conveyance by an insolvent person or partnership of an asset to another without a fair consideration is in fraud of creditors, without regard to the debtor's actual intent. (Civ. Code, §§ 3439.04 and 3439.08.) A conveyance made with actual intent to defraud is, of course, also in fraud of creditors. (Civ. Code, § 3439.07.) The creditor's remedies depend upon whether the claim has matured and include: setting the conveyance aside to the extent necessary to satisfy the claim or disregarding the conveyance and attaching or levying upon the property conveyed (where claim has matured); restraining defendant from disposing of the property; appointing a receiver to take charge of the property; setting the conveyance aside; or making any order which the circumstances of the case may require. (Civ. Code, §§ 3439.09, 3439.10.)

---

[3]The Uniform Fraudulent Conveyance Act (Civ. Code, § 3439 et seq.) sets forth four distinct types of such conveyances: (1) Conveyances with actual intent to defraud, hinder or delay creditors (§ 3439.07); (2) conveyances by a person who is or will be thereby rendered insolvent (§ 3439.04); (3) conveyances made without fair consideration by one engaged in business for which his remaining capital is unreasonably small (§ 3439.05) and (4) conveyances without fair consideration when one making the conveyance or incurring the obligation intends or believes he will incur debts beyond his ability to pay as they mature (§ 3439.06).

Plaintiffs alleged a separate cause of action for each of these four categories.

In applying this general rule to an alleged fraudulent conveyance of a life insurance policy the initial problem is determining the nature of the "asset" conveyed. When an insolvent debtor transfers a piece of nonexempt real or personal property to a third person without consideration there is a tangible asset of *fixed* value from which the creditor's claim can be satisfied. (Civ. Code, § 3439.09; see, e.g., *Ahmanson Bank & Trust Co.* v. *Tepper* (1969) 269 Cal. App.2d 333 [74 Cal.Rptr. 774].) An insurance policy, however, is not a thing of fixed value but is an agreement whereby one party for a consideration promises to pay money or perform some act of value to another on the destruction, death, loss, or injury of someone or something by specified perils. (*California Physicians' Service* v. *Garrison* (1946) 28 Cal.2d 790, 803-804 [172 P.2d 4, 167 A.L.R. 306], see also Ins. Code, § 22.) Since the policy is a promise to pay (on the happening of a specified event, such as death), what is the value of the asset transferred in fraud of creditors? Courts have variously determined this to be the cash surrender value of the policy at time of transfer, the premiums paid post transfer or the entire proceeds of the policy.

At common law the creditors of the insured were allowed to recover the entire *proceeds* of the policy. (See, e.g., *Taylor* v. *Coenen* (1876) 1 Ch. D. 636, 641; Cohen, *The Fraudulent Transfer of Life Insurance Policies* (1940) 88 U.Pa.L.Rev. 771, 775.)[4] The rationale for this rule was that by the payment of premiums the debtor had reduced his assets and the creditors were entitled to the property resulting from such payment, the insurance proceeds. (Cohen, at pp. 775-776.) The harsh treatment this rule accorded the debtor's widow apparently underlay subsequent decisions of some American courts that the creditors were entitled to reach only the cash surrender value of the policy or the amount of premiums paid subsequent to the transfer.[5] The cash surrender value approach is premised on the concept that the insurance policy is a contingent asset and when the policy is transferred, the creditors are injured only to the extent of the policy's cash surrender value or the value of the premiums paid. Had the debtor lived, they would of course be unable to levy on the proceeds of the policy. (See, e.g., *Union Central Life Ins. Co.* v. *Flicker, supra,* 101 F.2d at p. 862.)

In states which retain the common law rule[6] the ameliorative effect of the cash value approach was attained by the enactment of insurance protective statutes patterned on the original New York Verplanck Act.[7] (Cohen, *supra,* at

---

[4]Hereafter referred to as Cohen.

[5]For a collection of cases representing this view see *Union Central Life Ins. Co.* v. *Flicker, supra,* 101 F.2d at page 861.

[6]See footnote 4.

[7]See Code of Civil Procedure section 690.9.

p. 779.) The effect of these statutes was to declare at least some portion of the life insurance proceeds *exempt* from attachment by the insured's creditors. With this background, we review the relevant California authorities.

## II

In *Bryson* v. *Manhart, supra,* 11 Cal.App.2d 691, the insolvent insured changed the beneficiary of his insurance policy from his estate to his sister; approximately four months later he committed suicide. The sole creditor of his estate was an aunt from whom he had embezzled substantial sums of money entrusted to him for investment purposes. Inferentially the embezzled funds were used to pay premiums on the insurance policies as the decedent had only $4,000 in insurance prior to receipt of his aunt's money but acquired some additional $200,000 thereafter. The court ordered the transfers set aside as fraudulent. Citing to *Navassa Guano Co.* v. *Cockfield* (4th Cir. 1918) 253 Fed. 883 [6 A.L.R. 1168], the court reasoned the insured changed the beneficiary with knowledge that death was near and for the purpose of removing the insurance proceeds from his estate and the reach of creditors. The knowledge of impending death removed the element of contingency and gave the policy at the time of its transfer "an actual pecuniary value closely approximating its face amount." (*Bryson* v. *Manhart, supra,* 11 Cal.App.2d at p. 698.) It was this amount that was transferred in fraud of creditors, who were therefore entitled to reach the full proceeds to satisfy their claims.[8]

In *Union Central Life Ins. Co.* v. *Flicker, supra,* 101 F.2d 857, the Circuit Court of Appeals for the Ninth Circuit undertook to determine if California law allowed creditors to reach the entire proceeds of a fraudulently transferred policy or merely the cash surrender value. In deciding the creditors were not entitled to reach the entire proceeds of the policy the court distinguished *Bryson* v. *Manhart* as a transfer made in contemplation of death and assumed California courts would hold only the cash surrender value of the policy subject to execution. (At pp. 861-862.) The policy in that case had no cash surrender value and nothing of value was transferred, so the policy was a mere expectancy. The creditors were without a remedy as they were not injured by the transfer. (*Ibid.*)

In *The Prudential Ins. Co.* v. *Beck* (1940) 39 Cal.App.2d 355 [103 P.2d 241], the court applied the insurance exemption statute to a situation wherein an insolvent insured, whose estate was the named beneficiary, assigned the insurance policies to two individuals. When the debtor's estate sought to set aside the transfers as fraudulent the court construed the exemption statute to cover *all* moneys, benefits, privileges or immunities, accruing or in any manner growing

---

[8]The *Bryson* court rejected the case of *North British etc. Ins. Co.* v. *Ingalls* (1930) 109 Cal.App. 147 [292 P. 678], as inapposite. That case involved neither a change in beneficiary nor an insolvent insured/debtor. It is likewise inapplicable to the facts before us.

out of any life insurance, if the annual premiums did not exceed $500. (*Id.*, at p. 360.)[9] The court reasoned the plain meaning of the statute was to exempt such proceeds in the hands of the beneficiary from the debts of the insured. (*Ibid.*) And since any monies from the insurance policy would have been exempt in the debtor's hands, the creditors could not complain of the transfer of an asset which they could not have reached had the debtor retained it. (*Ibid.*) The court distinguished *Bryson* v. *Manhart* on the ground the exemption question was not an issue therein or ever discussed[10] (*id.*, at p. 362), holding that "no transfer of property made entirely exempt by statute, can be held to be fraudulent as to creditors." (*Id.*, at p. 359.)

### III

In our view the trial court erroneously construed *Bryson* v. *Manhart, supra,* 11 Cal.App.2d 691, to limit fraudulent conveyances of insurance policies to those situations in which the debtor changes the beneficiary of the policy from his estate to a third person. This appears to be the most conventional fact pattern, but there is no reason to make it a prerequisite. In actions to set aside a fraudulent conveyance, the relevant inquiry is whether the debtor has put some asset beyond the reach of creditors which would have been available to them but for the conveyance.

In this action, the original beneficiary was Miller's partner Oden and the insurance premiums were paid from partnership assets. This of itself evidences that the policy was a partnership asset. (See *Miller* v. *Hall* (1944) 65 Cal. App.2d 200, 207 [150 P.2d 287].)[11] Significantly, in this summary proceeding, the complaint alleged the insurance policy was a partnership asset, which for purposes of the demurrer is admitted. If any insurance proceeds are an asset of the partnership, such funds are subject to claims of plaintiffs as

---

[9]Code of Civil Procedure section 690.19, as relied on in *The Prudential Ins. Co.* v. *Beck* was renumbered to present Code of Civil Procedure section 690.9, subdivision (a), which provides: "All moneys, benefits, privileges, or immunities, accruing or in any manner growing out of any life insurance, if the annual premiums paid do not exceed five hundred dollars, ($500), or if they exceed that sum a like exemption shall exist which shall bear the same proportion to the moneys, benefits, privileges, and immunities so accruing or growing out of such insurance that such five hundred dollars ($500) bears to the whole annual premium paid."

[10]A second distinction between *Bryson, supra,* 11 Cal.App.2d 691, and *Beck, supra,* 39 Cal.App.2d 355, was found by Justice Peters to be the use of embezzled funds in *Bryson* to procure the insurance policies and that the defrauded person "could trace the embezzled funds into the insurance policies," the court in *Bryson* having stated: "Plaintiff is entitled to pursue the property fraudulently transferred and to force an accounting thereof from defendants." (11 Cal.App.2d at p. 696.) This alleged basis for the *Bryson* result finds scant support in the actual text of the *Bryson* case.

[11]This may be rebutted by a showing of a different intention by the partners, either by the conduct of the partners or the provisions of the partnership proceeding. (*Esswein* v. *Rogers* (1963) 216 Cal.App.2d 91, 95-96 [30 Cal.Rptr. 738].)

creditors of the partnership. (See generally, Annot., Insurance on Life of Partner as Partnership Asset (1974) 56 A.L.R.3d 892.) Moreover, as Miller's partner, Oden, was the original beneficiary, the policy proceeds, if not a partnership asset, would have been an asset of Oden.

The debts incurred by Miller were on behalf of the partnership (see, Corp. Code, § 15009, subd. (1)), and were the joint obligations of Miller and Oden. (Corp. Code, § 15015, subd. (b).) Oden was as fully liable for the debts of the partnership as Miller. (*Masoni* v. *Board of Trade of S. F.* (1953) 119 Cal. App.2d 738, 743 [260 P.2d 205].) The partnership itself was allegedly insolvent during this period and the insurance proceeds in Oden's hands would have been subject to plaintiffs' claims as partnership creditors. (*Ohio Cas. Ins. Co.* v. *Harbor Ins. Co.* (1968) 259 Cal.App.2d 207, 216 [66 Cal.Rptr. 340].) Defendant asserts Oden could have spent the proceeds of the policy the day after receiving them and plaintiffs would be without remedy. As Miller, Oden and Pioneer were insolvent Oden could *only* have transferred those funds for a fair consideration, then available for plaintiffs' claims. Had Oden transferred the proceeds without a fair consideration, this too would have been a conveyance in fraud of creditors. (Civ. Code, §§ 3439.04, 3439.08.)

IV

■ Assuming that plaintiffs by the presentation of evidence could establish the policy proceeds were subject to the creditors' claims but for the transfer, what *amount* of the policy was available to plaintiffs?

Respondent agrees and offers to stipulate that appellants may recover the amount of premiums paid subsequent to the change of beneficiary or the cash surrender value of the policy at such time whichever sum is greater. Since neither value is before us, the generosity of this offer cannot be ascertained. However, measured against appellants' concession at oral argument that any insurance proceeds attributable to an annual premium of $500 would be exempt under *The Prudential Ins. Co.* v. *Beck, supra,* 39 Cal.App.2d 355, it is more probable than speculative that either value is minimal.

Defendants rely on *Union Central Life Ins. Co.* v. *Flicker, supra,* 101 F.2d 857, as authority for the cash surrender value rule. The Ninth Circuit did not, of course, *decide* California law on this issue, but determined only what rule it felt California courts would apply in this situation. (At p. 862.) As noted, the cash surrender value rule arose as a method of alleviating the harsh effect of the common law rule on the widow of the debtor. This same relief, however, is provided by the exemption statute, which was discussed in neither *Union Central Life Ins. Co.* v. *Flicker,* nor *Bryson* v. *Manhart. The Prudential Insurance Co.* v. *Beck, supra,* 39 Cal.App.2d 355, established the applicability of the ex-

emption statute to alleged fraudulent conveyance actions. There can be no fraudulent conveyance of an asset which is made exempt from creditors' claims by statute. Code of Civil Procedure section 690.9 would apply in the instant case to exempt the insurance policy cash value or proceeds to the extent provided by statute from execution or levy by plaintiffs.[12] (39 Cal.App.2d 355, 360.)

Assuming the proceeds were in excess of the statutory exemption, may plaintiffs reach the excess? The concern for the debtor's widow which the cash surrender value rule was developed to address has been supplanted by the statutory exemption. The rationale supporting this rule, that the debtor has transferred nothing of value beyond the cash value or premiums, cannot withstand analysis without this social policy to bolster it. With the debtor's widow protected, the court must also think of creditors and their widows. (Cohen, *supra,* at p. 783.)

Clearly a life insurance policy has a present value beyond its cash surrender value. The policy may be likened to a promissory note, payable in the future. The date of payment may be uncertain, but its approach is inevitable.[13] Cases such as *Bryson* v. *Manhart, supra,* 11 Cal.App.2d 691, and *Navassa Guano Co.* v. *Cockfield, supra,* 253 Fed. 883, merely recognize the fact the impending death of the insured increases the present value of the policy to something approaching its face value. It can hardly be said the deathbed transfer of a life insurance policy from a debtor's estate to another does not "injure" creditors. (*Navassa Guano Co.* v. *Cockfield, supra,* 253 Fed. at pp. 885-886.) The insurance contract is a valuable asset of which creditors are deprived when such a change of beneficiary is made by an insolvent insured. We do not perceive that a transfer made in contemplation of death significantly alters the value of the policy at the time of the transfer. If the insolvent debtor abandons his suicide plans or recovers from his illness does the policy suddenly lose the value it had when fraudulently transferred? The fact of the insolvent insured's death, the contingency which triggers payment, is the critical factor. Were the transferred asset a piece of personal or real property the creditors would be entitled to levy on the present appraised value of the property above any exemption to the extent of their claims, regardless of whether the property appreciated in value from the date of the fraudulent transfer. (Civ. Code, § 3439.09; *Vest* v.

---

[12]Subsequent to *The Prudential Ins. Co.* v. *Beck, supra,* subdivision (b) was added to Code of Civil Procedure section 690.9 to provide a specific exemption for the surviving spouse and minor children of the insured. As Mrs. Miller was the designated beneficiary, this subdivision applies with equal force. It provides, "In addition to the foregoing, all moneys, benefits or privileges belonging to or *inuring to the benefit of the insured's spouse* or minor children growing out of life insurance purchased with annual premiums not exceeding five hundred dollars ($500), or if such annual premiums exceeded that sum, a like exemption shall exist in favor of such persons which shall bear the same proportion to the moneys, benefits, or privileges growing out of such insurance that five hundred dollars ($500) bears to the whole annual premiums paid." (Italics added.)

[13]"Death's a debt; his mandamus binds all alike—no bail, no demurrer." Sheridan, St. Patrick's Day (1775) act II, scene iv.

*Superior Court* (1956) 140 Cal.App.2d 91, 95 [294 P.2d 988].) Where the property is a contingent asset, the creditors should be allowed to reach the increased value should the contingency occur. We therefore conclude the creditors should be allowed to reach the proceeds of a fraudulently transferred life insurance policy even though the transfer was *not* made in contemplation of death.

## V

Appellants assert further error by the trial court in refusing to allow them leave to amend to allege the transfer was made in contemplation of death. The record before us does not disclose such a request but the absence thereof does not preclude appellate review of the issue. (Code Civ. Proc., § 472c; *Faulkner v. Cal. Toll Bridges Authority* (1953) 40 Cal.2d 317, 331 [253 P.2d 659].) ▮ Though the complaint may have appeared defective in this respect, " 'great liberality should be exercised in permitting a plaintiff to amend his complaint, and it ordinarily constitutes an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment.' " (*Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137].) The denial of leave to amend was an abuse of discretion even though the defect appeared to be one of substance. (*MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 542 [343 P.2d 36].) By amending to allege the transfer was in contemplation of death, plaintiffs would have stated a cause of action within the strictures of *Bryson* v. *Manhart, supra,* 11 Cal.App.2d 691.

By so holding, however, we do not retreat from our view that if the transfer of the insurance policy was made in fraud of creditors, they were deprived of a valuable asset at the time of the transfer and they are entitled to the proceeds of the policy in excess of the statutory exemption, irrespective of whether Miller intended to take his own life.

The judgment of dismissal is reversed and the cause remanded to the trial court with directions to vacate the dismissal and the order sustaining defendant's demurrer without leave to amend and to enter an order overruling said demurrer.

Puglia, P. J., and Regan, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 18, 1983.