In re WOLENSKY'S LIMITED
PARTNERSHIP, Debtor.

FEDERAL KEMPER LIFE
ASSURANCE CO.,
Plaintiff,

v.

WOLENSKY'S L.P., et al., Defendants.

Bankruptcy No. 92–01435.
Adv. No. 93–0025.

United States Bankruptcy Court,
District of Columbia.

Nov. 2, 1993.

Jeffrey M. Sherman, Trustee, Washington, DC, for debtor.

Robert N. Levin, Schweitzer, Bentzen & Scherr, Washington, DC, for movant:

Margaret Earnest, Washington, DC.

## DECISION AND ORDER DENYING SUMMARY JUDGMENT

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The court addresses a motion for summary judgment, a motion for appropriate relief (requesting the court to act on the summary judgment motion), and a renewed motion for

---

1. This committee had been formed prior to the filing of an involuntary petition in accordance with the Uniform Partnership Act to wind up the debtor's affairs.

2. As of the time the Balls filed their motion for summary judgment, the corporate charter of Wolensky's Inc., the sole general partner of the debtor, had been revoked. (Certificate Revoking Charter, Balls' Statement of Uncontested Facts, ex. 6.) Although the Committee which had pre-

---

summary judgment filed by the defendants, John and Beverly Ball (the Balls). These motions will be denied.

### I. *Procedural Background*

This interpleader suit began as a civil action brought by Federal Kemper Life Insurance Company (Kemper) in the United States District Court for the District of Columbia against the debtor, Wolensky's Limited Partnership, and other potential claimants to the proceeds of a life insurance policy totalling $450,000. On October 19, 1992, the civil action was transferred to the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a). On December 12, 1992, an involuntary petition was filed against the debtor in this district; the petition was duly granted. On March 4, 1993, the interim trustee for the chapter 7 estate of the debtor replaced the Committee of Limited Partners [1] as the representative of the debtor in the civil action. (Order by United States District Court for Eastern District of Virginia, Balls' Mot. for Approp. Relief, Ex. 1.) Upon motion of the trustee, the District Court referred the suit to the United States Bankruptcy Court for the Eastern District of Virginia which in turn transferred the suit to this court.

Meanwhile, the Balls' Motion for Summary Judgment had been filed on or about December 11, 1992; and on January 8, 1993, the United States, the limited partnership and the Balls had filed a stipulation ("Stipulation") of facts which included those that were contested.

By the time the suit reached this court, only three parties continued to assert an interest in the proceeds: (1) the Balls; (2) the trustee for Wolensky's L.P.; and (3) the United States.[2] The Balls contend that they are entitled to the proceeds as a matter of

---

viously asserted the debtor's right to the proceeds attempted to withdraw its claim to such proceeds, the court never approved the withdrawal and ordered the Committee's request to withdraw its claim null and void. (Order at ¶ 7; Ball's Mot. for App.Relief, Ex. 1.) Thus, I need not address the issue of whether the trustee would be bound by the Committee's attempted withdrawal.

law and thus that summary judgment is appropriate.

## II. Standard for Summary Judgment

The court's recent enunciation of standards for granting summary judgment in *Dicello v. Jenkins*, 160 B.R. 1 (Bankr.D.D.C.1993), is adopted here and will not be restated in this text. As set forth below, although many facts are not disputed, when the evidence is viewed in favor of the United States and the trustee, the law bars a grant of summary judgment in the Balls' favor.

## III. Undisputed Facts

The debtor, Wolensky's L.P., was formed on or about November 1, 1984. The business of the partnership, as set forth in the Limited Partnership Agreement and Certificate, consisted of (1) leasing certain property at 2000 Pennsylvania Ave., N.W., Washington D.C.; (ii) developing and operating a restaurant known as Wolensky's—The Foggy Bottom Bar and Grill; and (iii) carrying on any and all activities necessary, proper, and convenient or advisable in connection therewith or related thereto. (Limited Partnership Agreement, U.S.Supp.Resp., Ex. F and F1.)[3]

On or about November 22, 1985, an application was filed with Kemper for a life insurance policy on the life of James P. Sullivan. Sullivan was the principal manager of the restaurant operated by the limited partnership, Wolensky's Bar and Grill. He was also the president and principal stockholder of the corporate general partner of the limited partnership, Wolensky's Inc.[4] The application for the policy was signed by Sullivan, in his capacity as president of the corporate general partner, and by Gonzalo Munoz, another general partner of the limited partnership.[5] Kemper issued the policy on December 18, 1985, in the face amount of $450,000. This policy was structured as an increasing premium whole life insurance policy which had no cash surrender value for the first fifteen years. (Stipulation ¶ 9; Ball's Statement of Uncontested Facts, Ex. 1.) Because the policy was intended to be a keyman insurance policy, the limited partnership was named as both the owner and the beneficiary.

On June 5, 1990, Sullivan signed a form requesting Kemper to change both the ownership and the beneficiary of the policy to the name of his wife, Ann Ball Sullivan. (U.S.Supp.Resp., Ex. A; Kemper's Complaint, Ex. B; Balls' Supp.Mem. in Supp. of Mot. for Summ.J., App. 3.) The form was signed by Sullivan as president of Wolensky's Inc., the debtor's then sole general partner. Although Sullivan requested the change in June of 1990, Kemper did not effect the change until May 23, 1991. (Kemper Service Documentation Sheet, U.S.Supp.Resp., Ex. A.) It appears that the change was not effected earlier due to an oversight by Kemper.[6] Although it is agreed that the change in fact was made, whether the change was valid remains in dispute.

Wolensky's L.P. paid the premiums on the policy for 1990 and a part of 1991.[7] The record does not indicate why the partnership stopped paying the premiums. However, on March 7, 1991, which is around the time the payments ceased, Wolensky's L.P. filed a

---

3. Two different partnership agreements have been produced, and therefore there is a dispute as to which agreement is operative. (Earnest Decl. ¶ 10; U.S.Supp.Resp., Ex. 1.) However, the description cited above is the same in both versions.

4. Wolensky's Inc. was formed on November 20, 1984. (Articles of Incorporation, U.S.Supp. Resp., Ex. B.) The directors and incorporators were James P. Sullivan, Gonzalo Munoz, and Allan Borut. (*id*)

5. Munoz was a general partner from 1984 through September 1988. (Stipulation ¶ 3.)

6. A service documentation sheet produced by Kemper dated May 23, 1991 notes that Kemper received a telephone call from someone checking to see if the change in owner and beneficiary had been made and notes that it had not yet been done but the changes would be effective as of that date. (U.S.Supp.Resp., Ex. A.)

7. The following premiums had been paid by the partnership: (1) 12/28/89—annual premium $1,596, policy paid to 12/28/90; (2) 1/4/91— $484.95 quarterly premium, policy paid to 3/18/91; (3) 4/30/91—$484.95 quarterly premium, policy paid to 6/18/91 and (4) 5/8/91— $484.95 quarterly premium, policy paid to 9/18/91. (Stipulation, ¶ 12.)

voluntary Chapter 11 petition.[8] The insurance policy was not listed in the limited partnership's statement of financial affairs which was signed under penalty of perjury by Sullivan himself. (Bankruptcy Petition, U.S.Supp.Resp., Ex. H.)[9] On October 28, 1991, the voluntary bankruptcy case was dismissed.

On or about April 15, 1992, Robert Crawley of Crawley and Thomas Insurance, who handled the purchase of insurance for the limited partnership, requested that Kemper perform an audit to determine the status of the policy. (Kemper's Statement of Uncontested Facts, Ex. 2.) By letter dated May 19, 1992, Kemper informed Crawley that due to an administrative error on the part of Kemper regarding the sending of a notice of premiums due and a notice of default, the company was willing to reinstate the policy if premiums owed were brought up to date. (*Id.*) On or about May 21, 1992, Sullivan paid Kemper the premiums due, thereby bringing the account current, by a check drawn on the account of The Sullivan Companies, Inc. (Copy of Check, Kemper's Statement of Uncontested Facts, Ex. 3.) This company was owned by Sullivan and was not affiliated with any of the Wolensky entities. Kemper then reinstated the policy.

On May 28, 1992, Ms. Sullivan changed the beneficiary from her name to her parents, John and Beverly Ball.

On June 9, 1992, Sullivan committed suicide.[10]

On September 8, 1992, the charter of Wolensky's Inc. was revoked by the District of Columbia. (Kemper's Statement of Uncontested Facts, Ex. 6.)

On December 29, 1992, an involuntary Chapter 7 petition was filed against Wolensky's L.P.

**IV.** *Summary Judgment is Inappropriate at this Stage Because the Balls Have Not Established Authority for the Transfer or Adherence to Fiduciary Duty*

Despite the existence of the undisputed facts set forth above, the Balls have failed to prove material facts that are critical to the determination of who is entitled to the proceeds as a matter of law.

**A.** *Sullivan's Authority*

One material fact at issue is whether or not Sullivan had the authority to change the owner and beneficiary of the policy from the limited partnership to his wife. There are essentially two subparts to the issue of authority: (1) was Sullivan, as president, authorized to act on behalf of Wolensky's Inc. with respect to the limited partnership's insurance policy; and (2) even if Wolensky's Inc. authorized him to act, was Wolensky's Inc. authorized as the general partner of the limited partnership to change the owner and beneficiary of the limited partnership's insurance policy.

**1.** *Did Wolensky's Inc. Authorize Sullivan to Act?*

The first issue is whether Wolensky's Inc. authorized Sullivan to represent the corporation in its capacity as general partner with respect to making a change in the insurance policy. An officer of a corporation, such as Sullivan, is only authorized to act as specified in the corporation's bylaws or in a subsequent resolution by the board of directors that is not inconsistent with the bylaws. D.C.Code § 29–343(b); *See People v. Jasman,* 92 Mich.App. 81, 284 N.W.2d 496 (1979) (corporate president is not presumed to have power to act on behalf of the corpora-

---

**8.** The board of directors of Wolensky's Inc. passed a resolution authorizing Sullivan to file the petition. (Resolution, U.S.Supp.Resp., ex. H.)

**9.** In addition, the statement included a representation that the debtor had not transferred or disposed of any property other than in the ordinary course of business during the year preceding the filing of the petition and that it had no interest in any insurance policies. (*Id.*)

**10.** The policy contains an industry-standard "suicide clause" which provides that death of the insured by suicide within 2 years of the issuance of the policy would result in no payment to the beneficiary. Apparently Kemper treated the reinstatement of the policy as a continuance of the original policy.

tion).[11] No bylaws or resolutions have been offered as evidence in this proceeding.[12] Thus, the IRS correctly asserts that it is unclear based on the evidence thus far whether Sullivan possessed such authority. If not, then the transfer and change would not be effective to bind the general partner or for that matter, the limited partnership.

### 2. Sullivan's Authority To Act As General Partner with Respect to the Partnership's Interest in the Policy

Even if Sullivan was authorized by the corporation to make such a change, it is unclear whether Sullivan, acting for the general partner of Wolensky's L.P., was capable of acting on behalf of the limited partnership with respect to such changes in the policy without authorization by the partnership. Unless provided otherwise in the limited partnership agreement, a general partner of a limited partnership has the rights and powers and is subject to the restrictions and liabilities of a partner in a partnership without limited partners. D.C.Code § 41–443(a).[13] D.C. law provides that an act of a partner which is "not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership, unless authorized by the other partners." D.C.Code § 41–108(b) (1981); *Bole v. Lyle,* 39 Tenn.App. 679, 287 S.W.2d 931, 933 (1956); *In re Messenger,* 32 F.Supp. 490, 492 (E.D.Pa.1940). The debtor's limited partnership agreement provides that "... the general partners (acting for and on behalf of the partnership) shall, in their sole discretion, have full power in the management of the partnership business to do any and all acts and things necessary, proper, and convenient, or advisable to effectuate the purposes of the partnership." (Limited Partnership Agreement, U.S.Supp.Resp., Ex.'s F and F1.)[14] Although the agreement provides Sullivan with broad discretion in managing the business, it only authorizes him to take acts serving the business purposes of the partnership. Neither Wolensky's partnership agreement nor D.C. law provide the authority for Sullivan to take actions that are not for the purpose of carrying on the partnership's normal business.

As a result, if the transfer by Sullivan was not related to the ordinary business of the partnership, Sullivan's act of transferring the policy and changing the beneficiary was *ultra vires* and thereby ineffective to deprive the partnership of its interest in the policy. *See* D.C.Code § 41–108(b) (1981) (acts of one partner beyond the normal course of business do not bind partnership absent consent); *Bole,* 287 S.W.2d at 933 (partnership not bound unless partner's act is in furtherance and within the scope of the partnership business); *Boldemann Chocolate Co. v. Price,* 5 Cal.2d 200, 53 P.2d 946 (1936) (an officer's unauthorized act of changing the beneficiary is ineffective to divest the corporation of its interest as owner and beneficiary).[15]

If the transfer is found to be invalid, then the limited partnership would have at all times been the lawful beneficiary of the policy and, at the time of Sullivan's death, the

---

**11.** The business and affairs of a corporation are managed by a board of directors. D.C.Code § 29–332(a) (1981). Wolensky's Inc. had three directors: James Sullivan, Gonzalo Munoz, and Allan Borut. (U.S.Supp.Resp., Ex. B.)

**12.** The IRS has sought discovery of the corporation's by-laws and any resolutions that might have been passed authorizing Sullivan to take such action. However, to this date they have not been produced.

**13.** Title 41 of the D.C.Code codifies the Uniform Limited Partnership Act of 1987.

**14.** Once again, although there is a dispute as to which agreement is operative, the provisions regarding the general partners' powers are the same.

**15.** In *Boldemann,* the court addressed facts similar to the case at bar. A keyman insurance policy was to be taken out on the life of the corporation's president. The president, using corporate funds to take out the policy, named his estate as beneficiary rather than the company, and subsequently executed a declaration of trust, transferring the policy to a bank that would act as a trustee. The president instructed the bank to distribute the proceeds of the policy to the shareholders directly, and not to the corporation. The court held that since the president was without authority to transfer the policy, the corporation was "at all times the sole and exclusive owner" of the policy and that the policy "was not at the time of delivery, ... and never was, subject to said trust [of the bank]." *Id.* 53 P.2d at 947.

partnership would have been entitled to the proceeds. Given that Sullivan died before the involuntary petition was filed, the proceeds would have become property of the limited partnership's bankruptcy estate. On the other hand, if the transfer is held to be valid, then the partnership would appear to have relinquished its interest in the policy. However, the transfer might still be avoidable by the trustee as a fraudulent conveyance. See section V.B.

■■■ The Balls, as movants, have failed to offer any evidence suggesting that Sullivan had the authority to make such transfers; they simply claim that the issue of authority is irrelevant.[16] In response, the trustee and the United States contend that changing the ownership and beneficiary of an insurance policy owned by the partnership simply cannot be said to be in the usual course of partnership business, especially when the transfer was from the limited partnership in favor of Sullivan's wife for no consideration.[17] No evidence has been presented which suggests that Sullivan's change of ownership and beneficiary was within the normal course of the partnership's business. To the contrary, the evidence establishes that the business of the partnership was to operate the restaurant and to carry out any activities "necessary, proper, convenient, or advisable in connection therewith." (Limited Partnership Agreement, U.S.Supp.Resp., Ex.'s F and F1; Borut Decl. ¶ 3, U.S.Supp. Resp., Ex. 2.)

Given the character of the partnership's operations, it is unlikely that the Balls could successfully argue that the transfer by Sullivan to his wife was in any way necessary, proper, or advisable to the operation of the restaurant. Whereas the purchase of the policy was for a legitimate business purpose, that is, protecting the partnership's creditors, it is difficult, if not impossible, to conclude that the transfer of the policy, without consideration, to Sullivan's family member was an act effectuating the partnership's business. *See, e.g., Messenger,* 32 F.Supp. at 492 (sale of truck belonging to partnership engaged in plumbing business by one partner was invalid as not effected in usual course of business and not binding on partner nor creditors of the partnership); *Bole,* 287 S.W.2d at 933 (sale of timber by managing partner went beyond real and apparent scope of partnership business of manufacturing crates). Accordingly, the Balls have not produced sufficient evidence establishing authority for the transfer and thus summary judgment is inappropriate.[18]

### B. *Transfer As A Breach of Sullivan's Fiduciary Duty*

■■■ In addition to the issue of authority, there is also the related yet somewhat different question of whether the transfer was in breach of Sullivan's fiduciary duty to the limited partners. *See, e.g., Labovitz v. Dolan,* 189 Ill.App.3d 403, 136 Ill.Dec. 780, 784, 786, 545 N.E.2d 304, 308, 310 (1989) (general partner to exercise the highest degree of honesty and good faith in his handling of partnership assets)[19]; *McGlynn v.*

16. The Balls assert that an insurance policy as issued and accepted is *prima facie* the contract of the parties, and accordingly the policy as reinstated by Kemper is valid. *Penn Mut. Life Ins. Co. v. Abramson,* 530 A.2d 1202, 1210 (D.C.App. 1987). However, whether or not the policy itself is valid is not in dispute. The issue is whether the transfer by Sullivan was valid; Kemper's actions are irrelevant to the issue of Sullivan's authority. Kemper, by making the requested changes, cannot be said to have ratified any acts by Sullivan that exceeded his authority. Kemper merely reinstated the policy. If the transfer was invalid, then the policy would have been reinstated with the partnership as owner and beneficiary.

17. Prior to the appointment of the trustee, the limited partnership admitted in the Stipulation that was filed that James Sullivan lacked authority to transfer the ownership and redesignate the beneficiary of the subject policy. The Balls did not so stipulate. (Stipulation ¶ 3.)

18. Although it appears that it would be difficult to prove that such a transfer was in the normal course of the partnership's business, the Balls are entitled to the opportunity to produce evidence establishing that the transfer did effectuate the partnership's business.

19. Despite the fact that the partnership agreement granted Sullivan broad discretion in managing the partnership business, he still owed the limited partners a fiduciary duty that existed concurrently with the obligations set forth in the partnership agreement. *Id.* 136 Ill.Dec. at 786, 545 N.E.2d at 310 ("Language in an agreement

*Schultz,* 90 N.J.Super. 505, 218 A.2d 408, 413 (Ch.Div.1966) (general partner owes each limited partner a fiduciary duty); *Riviera Congress Assoc., L.P. v. Yassky,* 18 N.Y.2d 540, 277 N.Y.S.2d 386, 392, 223 N.E.2d 876, 879 (N.Y.App.Div.1966) (same). The policy, initially purchased at the expense and for the benefit of Wolensky's L.P., was partnership property. D.C.Code §§ 41–107(b), –124(a), –124(b)(1).[20] *Gas–Ice Corporation v. Newbern,* 263 Or. 227, 501 P.2d 1288, 1292 (1972) (keyman insurance policy was corporate asset absent evidence to the contrary); *Headen v. Miller,* 141 Cal.App.3d 169, 190 Cal.Rptr. 198, 202 (1983) (payment of premiums by partnership is evidence that policy was a partnership asset). Moreover, it is the policy as a whole that is an asset of the limited partnership, which includes the right to exercise any of the provisions in the policy, including one allowing a change of beneficiary. *Williamson v. Williamson Paint Mfg. Co.,* 113 W.Va. 744, 169 S.E. 408 (1933) (general manager who procured insurance on his own life pursuant to a corporate resolution for the benefit of the company held the right to change the beneficiary in trust for the company); *Wellhouse v. United Paper Co.,* 29 F.2d 886, 887 (5th Cir.1929) ("Whatever rights or privileges the insured had under the terms of the policy, he held in trust for the party from whom the consideration proceeded"). Thus, Sullivan could only exercise the right to change the beneficiary for the benefit of the partnership; to do otherwise would be a breach of his fiduciary duty. *See Gas–Ice Corp.,* 501 P.2d at 1292 (keyman insurance policy was corporate asset impressed with a trust under which president held as a fiduciary for benefit of corporation); *Ebest v. Bruce,* 734 S.W.2d 915 (Mo.Ct.App. 1987) (general partners' act of exercising partnership's right of first refusal for their own personal benefit was a breach of fiduciary duty). In addition, a transfer of partnership property by one partner for his own personal benefit is void as affecting the rights of the other partners in the property. *In re Decker,* 295 F.Supp. 501, 511 (W.D.Va. 1969) (citing William Draper Lewis, The Uniform Partnership Act, 24 Yale L.J. 617, 634 (1913) (if partner attempts to assign property for his own purposes he makes no assignment at all)); *Ebest,* 734 S.W.2d at 923 (asset acquired by a partner in breach of fiduciary duty is deemed to be held in trust for benefit of partnership).

■ Given the record before this court, it appears that Sullivan's transfer was not for the benefit of the partnership, but rather was for Sullivan's personal benefit. The burden is on Sullivan, or in this case the Balls, to prove that the transfer was just and equitable to the partnership. *Labovitz,* 136 Ill.Dec. at 787, 545 N.E.2d at 311 and cases cited therein.

### C. Alleged Lapse of Premium Payments

■ Although the parties agree that the limited partnership did not pay any premiums after May of 1991, they disagree as to the effect this lack of payment has on the partnership's interest in the policy. The Balls argue that the policy lapsed due to nonpayment and therefore the limited partnership's interest in the policy was extinguished. Thus, the Balls contend that when Sullivan reinstated the policy by using his own funds to pay the premiums owed, the policy at that point became his personal asset (or really his wife's because it was she whom he named owner) and, therefore, any events that occurred prior to the lapse are irrelevant.

The Balls, however, have mischaracterized the events surrounding the nonpayment of the premiums and therefore their analysis is flawed. The limited partnership defaulted on its payment of the premiums,[21] and due to

---

such as 'sole discretion' does not metamorphose the document into an unrestricted license to engage in self-dealing at the expense of those to whom the managing partner owes [a fiduciary duty].")

**20.** Each partner holds such property as a tenant in partnership. All partners have an equal right to possess partnership property for partnership purposes; but a partner is forbidden from using the property for any other purpose absent the consent of all partners.

**21.** It is unclear why the partnership stopped paying the premiums. Although one could infer that the limited partnership approved the change by Sullivan and thus no longer paid the premiums because it no longer had an interest in the policy, it is equally plausible to infer that the limited partnership overlooked the payments due

an error by Kemper, was never informed of the default. Upon learning of this error, Kemper offered to keep the policy in effect upon receipt of the premiums that were in default plus the premium payment for the next quarter. The premiums owed were paid and the policy remained in effect. Thus, irrespective of who actually paid the premiums owed, there was never any lapse in the policy that can be said to have extinguished the partnership's interest. Putting it differently, the policy included the right of reinstatement and that is what Sullivan required authority to convey from the partnership and was required to protect as a partnership asset.

■ Moreover, contrary to the Balls's assertion, the issue of authority and the events that occurred prior to Sullivan's payment of the premiums are relevant. If the transfer by Sullivan was invalid, then the limited partnership retained its interest as owner and beneficiary of the policy. Sullivan, as president of the general partner, held the policy for the benefit of the limited partnership; he was not free to convert the asset for his own personal benefit. *Gas–Ice Corp.*, 501 P.2d at 1293 (president wrongfully appropriated policy which was a corporate asset when he changed the beneficiary). Sullivan was unable to validate a misappropriation of a partnership asset by making payments with his own funds. Thus, Sullivan's payments to prevent the policy from lapsing were insufficient to deprive the partnership of its interest in the policy, including its right to change the beneficiary. To find otherwise would essentially ignore the fact that a misappropriation occurred. *Williamson*, 169 S.E. at 409 (fact that general manager paid a premium to prevent policy from lapsing did not secure him any right in the policy and took no right away from the company). *See also Boldemann*, 53 P.2d at 947 (rejecting argument that president, by abandoning his authority and proceeding upon a "new and different" venture, placed the policy beyond reach of the corporation and that corporation's only right is an action against the

president for damages or the return of the premiums paid by corporation).

■ Although Sullivan may have a right to reimbursement for the premiums he paid to prevent the policy from lapsing, the proceeds of the policy belong to the partnership. *See Walsh v. John Hancock Mutual Life Ins. Co.*, 221 Pa.Super. 484, 293 A.2d 71, 73 (1972) (a person who is not the owner of a policy and is not bound to pay the premiums, but because of some interest or color of interest in it voluntarily pays the premiums to keep the policy alive for the benefit of a third party, has the right to repayment of the payments made); *Thomas v. Farley*, 488 S.W.2d 285, 287 (Mo.Ct.App.1972) (same); *Perry v. Perry*, 484 S.W.2d 257, 260 (Mo. 1972) (person paying premium under mistaken belief that they are the beneficiary have right to refund of premiums paid).

## V. *Summary Judgment is Inappropriate Because, Viewed in the Trustee's Favor, the Facts Establish a Fraudulent Conveyance*

The trustee contends that the transfer was a fraudulent conveyance under D.C.Code §§ 28–3101 and –3103, and is thereby avoidable pursuant to 11 U.S.C. § 544(b). In response, the Balls assert that D.C.Code § 35–521 specifically exempts insurance proceeds from the reach of creditors of either Sullivan or the limited partnership and therefore the transfer is not subject to a fraudulent conveyance action by the trustee. In addition, the Balls allege that even if § 35–521 does not apply, an insurance policy with no cash surrender value is not property and thus cannot be the subject of a fraudulent conveyance action.

### A. *Applicability of D.C.Code § 35–521*

■ The trustee has argued that D.C. § 35–521 simply does not apply. He is correct. Section 35–521 states, in pertinent part,

to the fact that no one, including Sullivan, was aware that the premiums were not being paid. For summary judgment purposes, all inferences must be drawn in favor of the nonmovant. Thus,

for purposes of this motion, the court will infer that the limited partnership did not make a conscious decision not to pay the premiums.

When a policy of insurance, whether heretofore or hereafter issued, is effected by any person on his own life or on another life in favor of some person other than himself having an insurable interest therein, ..., the lawful beneficiary ... other than the insured or the person so effecting such insurance or executors or administrators of such insured or the person effecting such insurance, shall be entitled to its proceeds and avails against the creditors and representatives of the insured and of the person effecting such insurance....

■ The statute on its face only applies if a policy is effected by a person: (1) on his own life; or (2) on the life of another in favor of some person other than himself.[22] In this case, the policy was originally effected by the limited partnership on the life of another, Sullivan, in favor of "themselves", the limited partnership. *See Tolman v. Crowell,* 288 Mass. 397, 193 N.E. 60, 62 (1934) (person "effecting such insurance" is the one who takes out the policy or procures it to be taken out); *Proctor v. MacClaskey,* 278 Mass. 238, 179 N.E. 600, 602 (1932) (same). The Balls conceded at oral argument that Wolensky's L.P. is the party who effected the policy at the time it was first obtained and, therefore, the statute by its own terms does not apply. (Transcript of Hearing, August 19, 1993, at 35, 38.)

■ Notwithstanding this concession, the Balls attempt to argue that the statute should be applied as of the time of the reinstatement by Sullivan—that his action of paying the premiums was essentially "effecting" the insurance within the meaning of the statute. If the Balls' interpretation is correct, the policy would fall within the statute as a policy effectuated by Sullivan on his own life in favor of someone other than himself,

his wife. Some courts, however, have interpreted the same statute as only protecting those beneficiaries named when the policy was originally effected. *See, e.g., McCarthy v. Griffin,* 299 Mass. 309, 12 N.E.2d 836 (1938) (persons whose claims are based upon transfers subsequent to original issue cannot find shelter under the statute).

■ Assuming for the purposes of this discussion that the Balls' interpretation is correct and the statute does apply, the statute only provides that the lawful beneficiary is entitled to the proceeds as against the creditors of the person effectuating the insurance and those of the insured. *Kindleberger v. Lincoln Nat'l Bank,* 155 F.2d 281 (D.C.Cir.1946), *cert. den'd,* 329 U.S. 803, 67 S.Ct. 495, 91 L.Ed. 686 (1947). The statute does not provide that the beneficiary is protected from claims by any other creditors who assert an interest in the proceeds. *See Massachusetts Linotyping Corp. v. Fielding,* 312 Mass. 147, 43 N.E.2d 521, 524 (1942) (interpreting Mass. statute almost identical to section 35–521 as not providing protection from a prior beneficiary-owner's equitable interest in the proceeds that arose prior to the interest of the current beneficiary).[23]

To elaborate, assuming Sullivan's reinstatement of the policy was an "effecting" of the policy, the Balls correctly observe that they would be entitled to the proceeds free from the claims of the creditors of the insured and the person effecting the insurance. And according to the Balls' argument, the insured and the person effecting the insurance (when the policy was reinstated) was Sullivan. While the statute would prevent Sullivan's creditors from asserting a claim to the proceeds, it does not protect the new beneficiary from a cause of action by the

---

**22.** It is unclear whether the terms "in favor of some person other than himself" refers to "on his own life" in addition to "on the life of another." However, the analysis in this case is the same irrespective of which construction is followed.

**23.** In *Mass. Linotyping,* the evidence showed that there was an agreement between the corporation and the insured that the corporation would pay the premiums for the life insurance policy in exchange for the insured naming the corporation

as beneficiary. The corporation paid the premiums until the insured substituted his wife as beneficiary. From that time forward, the insured began paying the premiums himself. The court held that the corporation acquired an equitable right to the proceeds of the policy which it could enforce against the beneficiary notwithstanding the statute. *See also West End Sav. Bank v. Goodwin,* 223 Ala. 185, 135 So. 161, 163 (1931) (original beneficiary named in life insurance policy pursuant to express or implied agreement acquires indefeasible equitable interest).

trustee, who is asserting the rights of the creditors of the limited partnership as the prior beneficiary and owner of the policy. Accordingly, irrespective of whether the transfer is valid, Section 35–521 does not apply to protect the Balls from an action by the trustee on behalf of the partnership—which is not a creditor of Sullivan—regarding the proceeds.

### B. Is the Transfer Subject to a Fraudulent Conveyance Action?

■■■ Assuming for the purposes of this discussion that the transfer by Sullivan was valid, the trustee has argued that the change in beneficiary can be avoided as a fraudulent conveyance. There is a paucity of case law on the issue of whether a change of beneficiary on a life insurance policy is properly the basis of a fraudulent conveyance action. Moreover, the cases are in conflict on this issue. While some courts have determined that a policy of life insurance confers valuable property rights which, in the absence of the transfer, would go to the insured's estate, other courts have determined that the only thing transferred in fraud of the insured's creditors is the policy's cash surrender value. *Union Central Life Ins. Co. v. Flicker*, 101 F.2d 857, 861 (9th Cir.1939) (citing states following the conflicting rules). However, there is no case law in D.C. addressing this issue.[24]

The Balls urge this court to follow those jurisdictions holding that an insurance policy with no cash surrender value is not property and thus cannot be the subject of a fraudulent conveyance action. In support of their argument, the Balls cite *Coalter v. Willard*, 156 Va. 79, 158 S.E. 724, 725 (1931), in which the court held "it is clear that in Virginia, a life insurance policy before it has matured, and which has no cash surrender value, is not property ..." within the contemplation of the fraudulent conveyance statutes. The court reasoned that since the insured would never recognize the proceeds from the policy, the creditors of the insured likewise cannot be said to have had any interest in the proceeds. As a result, there was no injury to the creditor's by the insured's change in beneficiary. Thus, the court held that the insured's act of changing the beneficiary from his estate to his wife was not subject to a fraudulent conveyance action by the insured's creditors. *See also Equitable Life Assur. Soc. v. Hitchcock*, 270 Mich. 72, 258 N.W. 214 (1935) (creditors of insured cannot bring fraudulent conveyance action to avoid change of beneficiary when at the time of transfer the policy had no cash surrender value).

■■■ While this court agrees with the proposition that creditors cannot complain of a transfer of an asset that they could not have reached, it respectfully disagrees with those courts who have concluded that an insurance policy without any cash surrender value is beyond the reach of the insured's creditors. As correctly stated by the court in *Headen*,[25] the relevant inquiry when determining if a fraudulent conveyance action can be brought is "whether the debtor [or person making the conveyance] has put some asset beyond the reach of creditors which would have been available to them but for the conveyance." 190 Cal.Rptr. at 202.[26] And if the beneficiary of the policy prior to the change was the insured's estate, then the proceeds, but for the change, would at some point in

---

**24.** All the parties involved have argued the D.C. fraudulent conveyance statute. Thus, D.C. law governs the issue of whether there is a property interest in the proceeds. In addition, the partnership agreement provides that D.C. law governs.

**25.** The facts in *Headen* were similar to the present case. In *Headen*, the insured (one of two partners in a real estate business) purchased a life insurance policy with partnership assets, naming his partner as the beneficiary. 190 Cal. Rptr. at 199. At a time when both the insured and the partnership were insolvent, the insured

changed the beneficiary, naming his wife instead of his partner. Shortly thereafter, the insured died in an automobile accident. A creditor of the partnership brought suit claiming that the change of beneficiary on the life insurance policy was a fraudulent conveyance. *Id.*

**26.** That California has adopted the Uniform Fraudulent Conveyance Act is irrelevant to the discussion of whether or not the policy is subject to a fraudulent conveyance action. It is merely the standards that differ when attempting to prove such an action.

time be available to the insured's creditors.[27] Therefore, an insurance policy is an asset, albeit contingent and perhaps of only nominal value, of which the insured's creditors are deprived when such a change of beneficiary is made. *Headen*, 190 Cal.Rptr. at 203 ("Clearly an insurance policy has a present value beyond its cash surrender value. The policy may be likened to a promissory note, payable in the future. The date of payment may be uncertain, but its approach is inevitable.")[28]

■ A policy when still capable of being reinstated reserves to the owner the valuable right to reinstate in the event it becomes clear the insured will soon die. The debtor enjoyed at least that value of the policy. If that value was speculative and hence nominal, it nevertheless required that some consideration be paid to the partnership as owner for the policy's transfer.

■ Accordingly, this court holds that a change in beneficiary is subject to a fraudulent conveyance action by any creditor who would have had an interest in the proceeds

but for the transfer. To the extent courts hold otherwise, this court respectfully disagrees. Because Wolensky's L.P. was the original beneficiary under the policy, its creditors would have been entitled to the proceeds but for the transfer. *See In re John Hatton, Inc.*, 104 B.R. 705 (Bankr.W.D.Pa. 1989) (change of a beneficiary constituted a conveyance subject to a fraudulent conveyance action; corporation entitled to proceeds upon avoidance of transfer).[29] Therefore, the trustee may bring a fraudulent conveyance action in the event that this court finds the transfer is valid despite the questions addressed in part IV.

The Balls' reliance on *Commissioner v. Stern*, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958), and *United States v. Bess*, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958), does not persuade this court otherwise.[30] Both cases held that the IRS cannot attach proceeds of an insurance policy received by the beneficiary to satisfy the tax liability of the insured.[31] Neither case addressed

27. Where the beneficiary is originally some third party and the insured does not have the right to change the beneficiary, then the creditors of the insured would never have an interest in the proceeds. *See, e.g., United States v. Burgo*, 175 F.2d 196, 197 (3d Cir.1949).

28. In addition to *Headen*, several other courts have determined that a change of beneficiary, even if the policy has no cash surrender value, is subject to a fraudulent conveyance action by the insured's creditors. *See, e.g., Bryson v. Manhart*, 11 Cal.App.2d 691, 54 P.2d 778 (1936); *Navassa Guano Co. v. Cockfield*, 253 F. 883 (4th Cir.1918). However, these courts adopted a narrower rationale as to why the policy had any value to the insured's creditors. In these cases, the death of the insured was certain to occur in the near future. Thus, the courts reasoned that the fact of the insured's impending death increased the present value of the policy, thus having value to the insured's creditors. The court in *Headen* rejected this limitation, noting that although the fact of impending death makes the contingency more certain to occur, it does not ultimately change the value of the policy to the creditors. 190 Cal.Rptr. at 204. Even if this court were to follow the narrower rationale of these cases, the issue of Sullivan's state of mind at the time of the transfer would be relevant, thus barring summary judgment.

29. In *Hatton*, the debtor corporation, who was the original beneficiary in a keyman insurance policy, sought to avoid a change in beneficiary

pursuant to 11 U.S.C. § 544(b) and Pennsylvania's Fraudulent Conveyance Act, 39 P.S. § 354. Pennsylvania's Act defines conveyance as "any payment of money, assignment, release, transfer, ..." 39 P.S. § 351. In comparison, D.C.Code § 28–3101 enables the trustee to avoid "any conveyance or assignment." Although conveyance is not defined, in § 28–3103 there is an explicit reference to a "transfer."

30. The Balls also cite *Everett v. Judson*, 228 U.S. 474, 33 S.Ct. 568, 57 L.Ed. 927 (1913). However, in that case the Court addressed whether, under § 70(a) of the Bankruptcy Act, the property that vests in the trustee is that owned by the bankrupt at the time of adjudication or at the time of the filing of the petition. 228 U.S. at 479, 33 S.Ct. at 569. Given that Sullivan died prior to the filing of the involuntary petition, such a determination is unnecessary: the proceeds would be property of the limited partnership's estate under 11 U.S.C. § 541(a).

31. In *Bess*, the statute at issue, § 3670 of the Internal Revenue Code of 1939, provided that the federal tax lien can only attach to the insured's property *possessed during his lifetime*. Given this limitation, the court reasoned that even if the insured retained the right to change the beneficiary and designated his estate as beneficiary, the insured himself would never have a right to the proceeds during his lifetime. Thus, the proceeds of the insurance policy did not constitute proper-

whether the original beneficiary and its creditors have an interest in the proceeds. Moreover, these cases did not involve a fraudulent conveyance action as no changes had been made to the policies at issue. Accordingly, *Bess* and *Stern* are inapposite to the issue before this court.[32]

Nor does the fact that Sullivan paid a portion of the premiums to prevent a lapse change this court's holding. Whatever was conveyed at the time of the transfer is what is avoided as a fraudulent conveyance. *See McCarthy v. Griffin,* 12 N.E.2d at 837 (the transfer is avoidable in its entirety). As in the case of the questions of authority and breach of fiduciary duty (see part IV(C)), what Sullivan fraudulently conveyed was the entire policy, which includes the right to reinstate the policy to prevent it from lapsing. But for the transfer, the limited partnership would have had the right to reinstate the policy. Therefore, Sullivan was not free to disregard the partnership's interest and exercise the right for his own benefit.

C. *Even if the Transfer is Subject to A Fraudulent Conveyance Action, There Remain Material Issues of Fact in Dispute*

Assuming further that the court finds that the transfer is subject to a fraudulent conveyance action, material issues of fact in dispute still exist. As noted earlier, the District of Columbia has not adopted the Uniform Fraudulent Conveyance Act and instead has adopted three sections, D.C.Code §§ 28–3101, –3102, –3103, two of which are relevant to this proceeding.

While section 28–3103 concerns a fiduciary's suit to vacate fraudulent transactions,[33] section 28–3101 addresses a creditor's ability to avoid fraudulent transfers.[34] Few courts have interpreted section 28–3103. However, the courts have made clear that section 28–3101 of the D.C.Code requires clear and convincing evidence of fraud in fact. *Federal Deposit Insurance Corp. v. Cafritz,* 762 F.Supp. 1503, 1507 (D.D.C.1991); *District–Realty Title Ins. Corp. v. Forman,* 518 A.2d 1004, 1008 (D.C.App.1986) (citing *Troshinsky v. Rosin,* 428 A.2d 847, 849 (D.C.App.1981)). In addition, this section is to be liberally construed to suppress fraud. *Gibson v. Johnson,* 492 A.2d 574 (D.C.App. 1985); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Sorac, Inc.,* 1992 WL 182268 (D.D.C. July 14, 1992) (citing *Gibson* ).

Surely the evidence thus far is sufficient to raise a genuine issue as to Sullivan's intent at the time of the transfer. He caused an entity under his control to make a conveyance of a beneficial interest in a valuable insurance policy, which had been maintained by the limited partnership for several years, to his own wife, for no demonstrable consideration flowing from his wife to the entity deprived of the asset, Wolensky's L.P. *See, e.g., In re Estate of Wall,* 440 F.2d 215, 219

ty within the meaning of section 3670. 357 U.S. at 56, 78 S.Ct. at 1057. Similarly, in *Stern* the Court held that a Kentucky statute almost identical to D.C.Code 35–521 prevented the United States from forcing the lawful beneficiary to apply the proceeds to satisfy the tax liability of the deceased insured.

**32.** The Balls also rely on *Ruckel v. Metropolitan Life Ins. Co.,* 119 Kan. 593, 240 P. 409 (1925), as support for the argument that the transfer by Sullivan is not subject to the trustee's fraudulent conveyance action. However, the court in *Ruckel* simply did not address the issue before this court—whether the trustee, on behalf of the estate, can challenge a change in beneficiary as a fraudulent conveyance. In *Ruckel,* a creditor of the bankrupt corporation sought to challenge the trustee's decision to relinquish an insurance policy owned by the company to the insured. The court held that once the policy passed to the trustee, it was within the trustee's sole discretion

as to whether the policy should be relinquished to the insured, and was not subject to the creditor's action.

**33.** Section 28–3103 provides, in pertinent part, "A ... trustee of an estate ... of an insolvent ... corporation, association, partnership, or individual, may, for the benefit of all the creditors, disaffirm, treat as void, and resist all acts done, transfers, and agreements made in fraud of the rights of a creditor...."

**34.** Section 28–3101 provides, in pertinent part, "A conveyance ... of an estate or interest in land or its rents and profits, or in goods or things in action ... with the intent to hinder or defraud persons having just claims or demands, or their lawful suits, damages, or demands, is void as against the persons so hindered and defrauded ... The question of fraudulent intent is a question of fact and not of law."

(D.C.Cir.1971) (facts that may give rise to fraud are situations where one spouse is in financial straits.) In addition, in Wolensky's prior Chapter 11 proceeding, neither any interest in the policy itself nor any reference to its transfer was made in the Schedules and Statement of Financial Affairs filed under penalty of perjury and signed by Sullivan himself. Nor was there any mention of the policy in Sullivan's personal bankruptcy filings. (Sullivan's Petition, U.S.Supp.Resp., Ex. K.) For summary judgment purposes, inferences are to be drawn in favor of the nonmovant, and here it is plausible to infer that Sullivan was attempting to place an asset beyond the reach of the limited partnership's creditors for the benefit of his family.

## CONCLUSION

Viewing the evidence in favor of the nonmovants, this court is unable at this time to find that the Balls are entitled to the proceeds as a matter of law. Accordingly, it is

ORDERED that the Balls' motions for summary judgment and for appropriate relief and their renewed motion for summary judgment are DENIED.