In re **VICTOR INTERNATIONAL, INC.**, Debtor.

**Andrea Dobin, Trustee, Plaintiff,**

v.

**Taiwan Machinery Trade Center Corp., Defendant.**

**Bankruptcy No. 99–63248 (MS). Adversary No. 00–5198 TS.**

United States Bankruptcy Court, D. New Jersey.

May 24, 2002.

Jason S. Feinstein, Esq., Sterns & Weinroth, Trenton, NJ, for Andrea Dobin, Trustee.

Ronald Horowitz, Esq., Red Bank, NJ, for Defendant, Taiwan Machinery Trade Center Corp.

### OPINION

MORRIS STERN, Bankruptcy Judge.

Central to this opinion is the process of entering judgment by default following imposition of contempt-based suppression of

pleadings arising from the defendant's obstinate and continuing refusal to comply with discovery orders. The context is an adversary proceeding initiated by the trustee in bankruptcy of a corporate debtor whose close affiliate, the defendant, has succeeded to the debtor's entire business operation. Fraudulent conveyances are asserted by the trustee.

### Procedural History

Plaintiff Chapter 7 trustee (the "trustee") seeks entry of judgment by default against defendant, Taiwan Machinery Trade Center Corp. ("Taiwan Machinery"), in an adversary proceeding where, *inter alia*, the trustee alleged the fraudulent conveyance of essentially all of debtor's assets to its affiliate, Taiwan Machinery. The court has jurisdiction pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference by the United States District Court of New Jersey dated July 23, 1984. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(H).

The debtor, Victor International, Inc. ("Victor") filed a petition in bankruptcy on November 24, 1999. The trustee was duly appointed and her law firm was retained as her attorney. Victor, a New Jersey corporation formed in 1979, maintained its principal place of business at 31 Suttons Lane, Piscataway, New Jersey. It was in the business of selling and servicing industrial equipment, including heavy machinery (described as including mills, lathes and grinders in docket document 118 at ¶ 4). On July 31, 1998 the 17th Judicial Circuit of the State of Michigan entered a judgment against the debtor in the amount of $224,968.16 on behalf of Douglas Furness. The suit was based upon personal injury arising out of use of the debtor's product. The judgment was docketed in the Superior Court of New Jersey on April 27, 1999. It appears to have been the direct causative factor in what became the cessation of the debtor's business, transfer of the essence of its business to its affiliate, and the bankruptcy filing.

Taiwan Machinery is a California corporation formed in October 1978, with its principal place of business at 3111 Via Mondo, Rancho Dominguez (sometimes listed as "Compton"), California. As will be developed, Taiwan and Victor were closely interlocked and affiliated.

The debtor's bankruptcy petition listed only four debts, all general unsecured claims, totaling $345,269.00. These listed debts are: the judgment to Douglas Furness for $224,968.00; a loan-based debt in the amount of $84,000.00 to Alen and Mary Huang, shareholders in both Victor and Taiwan Machinery; a debt in the amount of $15,301.00 due to the law firm which defended Victor in the Furness product liability action; and, a business debt in the amount of $21,000.00 to Taiwan Machinery. Only the first three creditors (Mr. Furness, the Huangs and the law firm) filed proofs of claim in this case. The debtor's petition listed assets totaling $12,281.00.

On May 10, 2000 the trustee filed a two-count complaint initiating the adversary proceeding against Taiwan Machinery. The trustee alleged that the debtor fraudulently transferred its assets to the defendant, actionable under 11 U.S.C. § 548(a)(1)(A) and the New Jersey Uniform Fraudulent Transfer Act, N.J.S.A. § 25:2–25(a), 25(b), and 27, incorporated into this adversary proceeding through 11 U.S.C. § 544(b). On June 12, 2000 the defendant filed an answer, counterclaim and jury demand. The answer largely denied the allegations in the complaint, averring that the demise of the debtor's business was due to market forces beyond its control and charging the trustee with having misappropriated a vendor payment in the amount of $9,521.05 which was "in-

correctly payable" to Victor rather than to Taiwan Machinery.

The parties undertook discovery. Defendant propounded its first (and only) set of interrogatories upon plaintiff on or about June 9, 2000. The plaintiff propounded its first (and only) set of interrogatories upon defendant on or about June 28, 2000. On September 13, 2000, after an August 28, 2000 pre-trial conference, the court (the Honorable Stephen A. Stripp) entered a pre-trial order. Because the defendant had requested a jury trial and did not consent to a bench trial by the bankruptcy court, the order pre-supposed that the adversary proceeding would be tried by the district court, that the bankruptcy court would manage pre-trial discovery, and that application would be made to the district court for an order withdrawing the reference for this case. (The reference has never been withdrawn.) The court adjourned the pre-trial conference to January 22, 2001 and required the parties to submit discovery status reports prior to that date.

From December, 2000 until April, 2002 the parties engaged in discovery and motion practice which was driven by the defendant's failure to comply with the plaintiff's discovery requests and, ultimately, with the court's orders to produce. This sixteen-month period included at least four scheduling conferences and culminated in the court's holding the defendant in contempt, striking its answer, defenses and counterclaim, and entering default on April 4, 2002 for the defendant's failure to comply with court orders. Now, the court is called upon to advance the default to judgment.

Events leading to the entry of default begin with the court's first scheduling order[1] of February 15, 2001, which imposed

discovery deadlines and granted the trustee's motion to compel Taiwan Machinery to answer certain interrogatories which it had refused to answer. Thereafter, and following submission of these answers, the trustee deposed an employee of both the debtor and the defendant, Frank Shen, and Alen Huang, president of both corporations.

On March 5, 2001 the trustee served upon the defendant a request for production of its tax returns, including but not limited to federal and state income tax returns and state sales tax returns, for the years 1995 through 2001. The defendant resisted production. The trustee argued in her motion filed on April 9, 2001 to compel production that she required these returns to trace the absorption of the debtor into the defendant corporation. The trustee argued that the defendant's offer to provide unaudited financial information about the "New Jersey operation" was inadequate. The defendant responded, claiming that the trustee had not met its burden to overcome the presumption against production of tax returns.

In its order entered on June 20, 2001 the court denied without prejudice the trustee's request for production of tax returns, but required instead that the defendant provide records relating to the performance of the east coast operations of Taiwan Machinery, previously only summarized in its answers to interrogatories, which the defendant conducted out of its New Jersey office.

The defendant failed to produce the required financial records by the second scheduling conference, July 9, 2001. During that conference, the court admonished that it had forborne ordering the production of tax returns because the defendant had previously promised to produce other

---

**1.** This order arose out of the court's scheduling conference of January 22, 2001.

financial records, and, that the defendant's behavior put in question its good faith (Stripp, July 9, 2001, T15–14 to 17–5). Because the defendant stated that its fiscal year did not end until September 30, 2001, the court ordered the defendant to produce (1) for the fiscal year that ended September 30, 2000, financial statements plus the documents relied upon to produce them; and (2) interim financials thereafter, as well as all documents through June 30, 2001 which would eventually be relied upon to produce the financial statements for the fiscal year to end September 30, 2001 (*id.* at T20–13 to 24 and T21–2 to 19). The defendant through counsel made the significant statement during oral argument that it could not segregate the New Jersey and west coast operations of Taiwan Machinery (*id.* at T–21–20 to 22–12), which prompted the court to require the defendant to produce financials for its entire business operation for three years before and the period after the commencement of the New Jersey operation (*id.* at T22–22 to T24–8).

On August 7, 2001 the court entered the second scheduling order (docket document 50) based upon the July 9, 2001 conference. The court ordered the defendant to produce company-wide financial statements for the three years prior to the entry of Taiwan Machinery into New Jersey, (1996, 1997, and 1998), and to produce financial statements for the east coast operation out of the New Jersey office from the date of commencement of New Jersey business through June 30, 2001, along with all underlying documents. The deadline for production was August 17, 2001, and the order specifically warned the defendant as follows:

5. The Court has cautioned Defendant that if it fails to produce all of the documents and information set forth above by August 17, 2001, then pursuant to Federal Civil Procedure 37 the Court

may exercise its discretion to: hold defendant in contempt; compel Defendant to produce its federal tax returns; strike Defendant's answer and proceed to a proof hearing for the entry of judgment in Plaintiff's favor; or do one or more of the foregoing; or provide such other relief as is appropriate.

*The defendant failed to produce the required documents at that time.*

The trustee had deposed Alen Huang again on June 21, 2001 and requested additional document production at that time. The trustee reiterated this request in a letter dated July 12, 2001 and then in a request for document production dated July 18, 2001. The five items requested were (1) documents reflecting the date on which Taiwan Machinery commenced operations in New Jersey; (2) the first rent check issued by Taiwan Machinery to the Huangs for the New Jersey premises; (3) documents indicating the east coast customers which Taiwan Machinery served prior to occupying the New Jersey premises; (4) documents reflecting the date on which Taiwan Machinery was authorized to do business in New Jersey; and (5) the first set of payroll records of Taiwan Machinery for New Jersey employees.

At the third scheduling conference on September 4, 2001, the court held the defendant in contempt of the August 7, 2001 order (1) for failing to produce financial statements through June 30, 2001; and (2) for failing to produce all underlying documents, information and data relied upon to compute its financial statements, and, in particular for failing to produce the relevant invoices. In the third scheduling order entered on September 20, 2001, the court fined defendant $200.00 per day from (and including) August 18, 2001 for each day that the defendant failed to comply with each of these two discovery requests.

The court "reordered" the defendant to produce the required documents by a date certain or risk increased sanctions, and the court further ordered the defendant to produce its federal, state and sales tax returns for all fiscal years from that ending September 30, 1996 "to the present," by a date certain, with a continuing order to produce any subsequently filed returns. The court also ordered the defendant to comply with the document request in the trustee's July 12, 2001 letter incident to the second deposition of Mr. Huang.

On October 9, 2001 the defendant filed an out-of-time Motion for Reconsideration or Stay Pending Appeal of the September 20, 2001 Scheduling Order.[2] On November 1, 2001 the trustee filed a Cross Motion to Hold Defendant in Contempt, to Fix the Amount of Sanctions, and for Additional Limited Discovery.[3] After several adjournments, the return date of the motion and cross motion was ultimately scheduled for January 24, 2002 to coincide with the next status conference.

On January 24, 2002 the court granted in part and denied in part the defendant's application for reconsideration and entered a new scheduling order. The trustee stated on the record on January 24, 2002 that, but for the issue of production of tax returns and the amount of sanctions due, the trustee had received "as of Friday of last week," that is as of January 18, 2002, all other discovery which the court had ordered to be produced (document 91 at T6–9 to 19), except that the trustee had not received segregated expenditure information, information related to the cost of goods, or information which would allow the trustee to evaluate the profitability of the defendant's New Jersey operation (document 91 at T10–2 to 9).

The January 24, 2002 hearing resulted in an order entered on February 5, 2002 (document 82). That order relaxed sanctions and discovery requirements applicable to the defendant. It mitigated the monetary sanctions by accepting the more limited "day count" proposed by the defendant's counsel, and by vacating one entire category of monetary sanctions (i.e., sanctions for failure to provide the interim financial statements, since the year end September 30, 2001 statement was provided). The court thus capped at $4,400.00 for twenty-two days the monetary sanction arising from the September 20, 2001 order for defendant's delay in producing the underlying invoices; the trustee had sought $6,600.00 for thirty-three days for this category of documents, plus monetary sanctions for failure to produce the interim financial statement (document 91 at T17–7 to 15 and T20–21 to 23). The defendant was to pay the sanction by April 24, 2002.

The court denied defendant's request for wholesale recision of the court's September 20, 2001 order, paragraph 3(e), which required the defendant to produce its federal, state and sales tax returns for fiscal years ending September 30, 1996 to the present (document 82, February 5, 2002 order, paragraph 1(c)). Rather, the discovery requirement was reduced to production of federal and state tax returns *excluding* sales tax returns, from 1996 (rather than 1995) to the present. And, all of this production was to be subject to a Confidentiality Agreement to be negotiated by the parties by February 4, 2002, with the tax returns to be produced by March 4, 2002 (document 82, paragraph 1(c)). If the parties were unable to negotiate the form of the Agreement, the order provided that the court was to resolve the

---

**2.** Docket Documents (hereinafter "Documents") 61, 62, 63.

**3.** Documents 65, 66, 67.

dispute on February 11, 2002. The order required further production of defendant's invoices and established additional discovery deadlines for submitting expert reports and concluding depositions.

At the January 24, 2002 conference, the trustee's motion to hold the defendant in contempt was denied.

As of February 5, 2002 the parties could not agree on the form of order for the January 24, 2002 hearing, much less on the form of Confidentiality Agreement. The court conducted a telephone conference on February 5, 2002 to resolve the form of order for the January 24, 2002 status conference (document 86, minute sheet memorializing telephone conference) and on February 5, 2002 entered a modified form of the order submitted by the trustee.[4]

On February 22, 2002 the court, having considered the parties' dispute as to the form of Confidentiality Agreement, entered a Protective Order which established the procedure under which the trustee, its attorney and its accountant would, in confidence, handle the defendant's tax returns pursuant to the orders for production (document 93).

On March 6, 2002 the trustee filed a Notice of Motion to hold the defendant in

4. After the close of chambers on February 5, 2002 the defendant telefaxed the court a letter which announced that defendant wished to appeal the February 5, 2002 order to the District Court and asked the court to grant him a ten-day extension to February 25, 2002 to file a styled "Notice of Appeal" under Fed. R. Bankr.P. 8002(c)(2) to February 25, 2002 to accommodate personal and professional commitments of defendant's counsel (document 83, letter dated February 5, 2002 from Ronald Horowitz, Esq.). The trustee filed a February 6, 2002 letter which objected to defendant's failure to make the request in the proper form of a notice of motion as required by Fed. R. Bankr.P. 8002(c)(2); deemed that the defendant had underestimated the remaining appeal period, as it did not begin to run until the February 5, 2002 order was docketed; and asked the court to deny the request in any event, as the defendant could have begun his appeal papers any time after the court ruled from the bench on January 24, 2002 (document 84, letter dated February 6, 2002 by Jason S. Feinstein, Esq.). In a letter opinion dated February 7, 2002 (document 85) the court denied the defendant's request on the bases that defendant had not couched the application in the form of notice of motion; that, leaving aside the issue of form, the February 5, 2002 letter contained no substantive basis for an extension; that the extension was neither necessary nor justified; and that further delay in discovery was not justified (document 85, letter opinion dated and filed February 7, 2002). The court noted the trustee's objection. The letter opinion reiterated that the production of tax returns and the payment of monetary sanctions were separately ordered under the September 20, 2001 order. *The court declared that it would not stay the order of February 5, 2002 or of September 20, 2001* (document 85, letter opinion, February 7, 2002). On February 15, 2002 defendant filed a "Motion for Leave to Appeal the orders of September 20, 2000[sic] and of February 5, 2002" (documents 87, 88, 89, Notice of Appeal, Proof of Service, Motion for Leave to Appeal). The trustee filed a Notice of Cross Appeal on February 25, 2002 (documents 94, 95, and 96, Notice of Cross Appeal and Brief filed on February 25, 2002).

On March 5, 2002 defendant submitted a letter (filed in the proceeding jacket but not docketed) which covered a "Notice of Allocation and Assignment" (docketing notice) of the adversary proceeding in the District Court of New Jersey. This court's chambers confirmed with the Office of the Clerk of the District Court that the docketing notice applied to the defendant's Motion for Leave to Appeal and had nothing to do with the eventual, anticipated withdrawal of reference, for which one of the parties would have to apply when discovery was complete. Nonetheless the defendant in his March 5, 2002 letter deemed on the basis of this Notice that the District Court now had jurisdiction of the entire case, that the Bankruptcy Court was divested of jurisdiction, that the production of defendant's tax returns and payment of sanctions should await the outcome of the appeal; the defendant suggested that the status conference scheduled for March 27, 2002 was moot.

contempt for violating the February 5, 2002 order for failing to produce the required tax returns (as well as invoices) by March 4, 2002 (documents 99, 101 and 102).

At a March 14, 2002 hearing, the court, rejecting argument that it was without jurisdiction, held the defendant in contempt of the February 5, 2002 order (document 108, Order Holding Defendant in Contempt, filed on March 21, 2002). The court found that the defendant "knowingly, willfully and in bad faith" failed to comply with the February 5, 2002 order for the production of tax returns and invoices.[5] The defendant was ordered to pay monetary sanctions of $3,734.50 as a compensatory amount (counsel fees and costs) and punitive sanctions of three times that amount, $11,203.50, to the trustee by March 25, 2002 at 10:00 a.m. Provision was made to halve the punitive amount if the defendant tendered the previously ordered tax returns by March 18, 2002 at 4:00 p.m. The defendant's attorney committed on the record at the March 14 hearing that his client would meet this deadline. The order warned:

> 3. The Court has cautioned Defendant that if it fails to fully comply with the February 5, 2002 Order and pay all of the ordered sanctions as set forth above, then at the next Status Conference on March 27, 2002, pursuant to Federal Rule of Civil Procedure 37 the Court may exercise its discretion to: hold Defendant in contempt; impose escalating

monetary sanctions; strike Defendant's answer and proceed to a proof hearing for the entry of judgment in Plaintiff's favor; or do one or more of the foregoing.

On March 22, 2002 the defendant's counsel sent the court a telefax stating that: his client "was very disappointed about the March 14, 2002 rulings"; the client maintained that it had the right to withhold its tax returns; and, the defendant would not honor the commitment to send its tax returns to the trustee "without further review by the District Court and/or the Court of Appeals" (document 107). Apparently, the defendant took umbrage with this court's March 14 ruling *and* that of the District Court. There, the defendant's application for a stay and other relief had been denied and the resulting order, citing *Powell v. Ridge*, 247 F.3d 520, 524 (3d Cir.2001), included a finding "that the Orders [September 20, 2001 and February 5, 2002] are not immediately appealable as of right *because they do not involve a recognized privilege.*" (Emphasis added; document 116.)

The trustee filed a motion to again hold the defendant in contempt, now of the order of March 21, 2002 (documents 109, 111, 112, and 113). At the hearing of that motion on March 27, 2002, the defendant was once more held in contempt. The court's order of April 3, 2002 (document 117) recited the following findings:

---

**5.** On March 14, 2002, immediately before his appearance in Bankruptcy Court, the defendant appeared before the District Court on his Notice of Motion for Leave to Appeal and other applications. The Order entered by the District Court on March 27, 2002 on that hearing denied defendant's application for stay of the "underlying litigation" pending appeal; denied defendant's motion for leave to appeal; denied without prejudice defendant's motion to withdraw the reference of the case to the Bankruptcy Court; ordered that the Bankruptcy Court retain jurisdiction of the case until a proper Notice of Motion for withdrawal of the reference should be filed and granted; and marked the case closed (document 116, certified copy of the Order entered by Garrett E. Brown, Jr., U.S.D.J., on March 27, 2002). The defendant reported the results of the District Court hearing to this court that same day.

a. The Defendant is in Contempt of The Court's Order of March 21, 2002.

b. The Defendant has personal responsibility for the contumacious conduct.

c. The Defendant has a history of foot-dragging, stonewalling and is stubbornly refusing to comply with this Court's Orders.

d. The Defendant has exhibited bad faith.

e. Further monetary sanctions against the Defendant will not induce it to comply with this Court's Order of March 21, 2002.

f. The Trustee's complaint against the Defendant *prima facie* has merit, but the Defendant's contempt of this Court's Order of March 21, 2002 is preventing the Trustee from being able to prepare her case having an adverse effect on the litigation.

g. This Court has jurisdiction to enter default and default judgment, if appropriate.

The defendant's pleadings were struck and default was entered.

### Rule 37 Sanctions—Pleadings Struck

■ The sanction in Fed.R.Civ.P. 37(b)(2), adopted verbatim in Fed. R. Bankr.P.7037(b)(2), allows the court to strike a party's claim or pleading for failing to comply with a discovery order. The rule codifies the court's authority to create a presumption of fact "that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit of the asserted defense." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), citing *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 350–351, 29 S.Ct. 370, 53 L.Ed. 530 (1909). The imposition of the Fed.R.Civ.P. 37(b)(2) sanction must be just (fair and measured under the circumstances of the case) and related to the claim at issue in the discovery order. *Insurance Corp. of Ireland, Ltd.,* 456 U.S. at 707–708, 102 S.Ct. 2099. *See In re Golant,* 239 F.3d 931, 937 (7th Cir.2001) (default judgment denying bankruptcy discharge was the court's only recourse where the defendant-debtor repeatedly defied discovery orders, even in the face of the court's warning).

■ In this case, the trustee's complaint was grounded in the obvious replacement of the debtor's business in New Jersey with that of the defendant. The defendant—early on—resisted discovery. The required tax returns would, if produced, have in the court's view been probative in evaluating debtor-defendant transfers. Yet notwithstanding the foregoing and the imposition of a protective order, several warnings and monetary sanctions (as well as the offer of reduced monetary sanctions), Taiwan Machinery stubbornly refused to comply with court orders. The trustee was thus stymied in her discovery efforts, and the court has been likewise stymied in bringing this matter to trial. And, most fundamentally, the court cannot permit its orders to be flouted without, however reluctantly, imposing this ultimate sanction.[6]

---

**6.** *See Poulis v. State Farm Fire and Casualty Co.,* 747 F.2d 863, 868 (3d Cir.1984) (listing factors to consider in imposing sanctions of dismissal with prejudice or of default judgment: "(1) the extent of the *party's* personal *responsibility;* (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith;* (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative sanctions;* and (6) the *meritoriousness* of the claim or defense" (emphases in original)); *Hoxworth v. Blinder, Robinson & Co., Inc.* 980 F.2d 912, 919–21 (3d Cir.1992)

## Statement of Facts

Ming Yuan "Alen" Huang ("Mr.Huang") is the president of both Victor and Taiwan Machinery (deposition of Alen Huang, April 20, 2000, T7–20 to 22 and T11–24 to 12–2).[7] Mr. Huang signed the bankruptcy petition filed by Victor on November 24, 1999 as "President." He worked "a little bit" for Victor, overseeing the operation of the company, but did not consider himself a full-time employee of Victor (*id.* at T11–14 to 23). Mr. Huang estimated that he owned thirty percent of the debtor's stock of Victor and twenty to thirty percent of the stock of Taiwan Machinery (*id.* at T7–23 to T8–2 and T12–1 to 9). As to the Victor stock, M.L. "Mary" Huang (Mr. Huang's wife) owns twenty percent; M.H. Huang (Mr. Huang's brother) owns twenty percent; and, Jin Long Lai (no relation) owns the remaining thirty percent (*id.* at T8–3 to 25).

Mr. Huang, his wife and another Victor shareholder also sat on its board of directors (*id.* at T11–4 to 6). Besides Alen, Mary Huang is a shareholder of the defendant (Huang, April 20, 2000 at T12–10 to 12–21; and defendant's answer to interrogatory 8(h)[8]). There were reported to be five other shareholders of Taiwan Machinery including yet another brother of Mr. Huang (defendant's answer to interrogatory 8(h) and Huang, April 20, 2000 at T12–10 to T13–13).

After the entry of the Furness judgment, in late fall of 1998 or early in 1999, Taiwan Machinery began operating out of the premises of Victor. Mr. Huang testified variously that Victor occupied the premises at 31 Suttons Lane until the end of 1998 or beginning of 1999 (Huang, June 21, 2001 at T28–1 to 4)[9]; that Taiwan Machinery began operations in New Jersey at the end of 1998 or beginning of 1999 (*id.* at T24–5 to 8); and, that Victor vacated the premises a few months before Taiwan Machinery began to occupy them (*id.* at T28–5 to 20). Frank Shen, working first for Victor and then for Taiwan Machinery, pegged his employment transition as being late 1998 or early 1999 (Shen, March 14, 2001 at T70–18 to T72–9 and T75–6 to T76–18).[10] A utility bill for service through November 11, 1998 lists "Taiwan Machinery Co. Trade Center" as the payor at 31 Suttons Lane, Piscataway,

---

reiterates the *Poulis* factors, noting that all six factors are not necessary for the entry of default. *Sub judice*, all factors persist, justifying the default judgment sanction. *See also Avionic Co. v. General Dynamics Corp.*, 957 F.2d 555, 558 (8th Cir.1992) ("[w]hen the facts show willfulness and bad faith, the selection of a proper sanction, including dismissal, is entrusted to the sound discretion of the district court," and upholding dismissal of the complaint when plaintiff refused to identify the source of an alleged promise, the investigation of which was critical to the defendant's defense of breach of contract action).

7. An excerpt of this deposition transcript is attached as Exhibit E to trustee's Affidavit in Support of Entry of Default Judgment, filed on April 15, 2002; all subsequent references to Mr. Huang's April 20, 2000 deposition are to this excerpt.

8. The interrogatories which the trustee propounded upon defendant on June 28, 2000 and defendant's answers to 1 through 9 are attached as Exhibit C to document 13; answers 10 through 24 are attached as Exhibit E to document 26.

9. An excerpt of this deposition transcript is attached as Exhibit F to trustee's Affidavit in Support of Entry of Default Judgment, filed on April 15, 2002; all subsequent references to Mr. Huang's June 21, 2001 deposition are to this excerpt.

10. An excerpt of Frank Shen's March 14, 2001 deposition transcript is attached as Exhibit H to trustee's Affidavit in Support of Entry of Default Judgment filed on April 15, 2002; all subsequent references to Mr. Shen's March 14, 2001 deposition are to this excerpt.

New Jersey.[11] Defendant's answers to the trustee's interrogatories 8(d), 10(a) & (b) identify the start in January 1999.

The Furness judgment was key to the decision to operate Taiwan Machinery from the location occupied by Victor, and to shut down Victor. The defendant alleged in its defense (now stricken) that the "demise and insolvency" of Victor "was caused by market conditions beyond its control."[12] The defendant subsequently explained:

> Customers were concerned about the company's [Victor's] viability after rumors circulated that Victor International lost a product liability lawsuit. Customers lost confidence in the company and did not purchase additional machines from them. At that time, there were also rumors that Victor International was already bankrupt.[13]

Mr. Huang stated that Victor stopped operating "because the business went down" (Huang, April 20, 2000 at T25–9 to 17). Mr. Huang observed that business had been fine but that Victor became subject to "a very strange judgment"—strange, he believed, because Victor never sold machinery in the Michigan area (id. at T25–18 to 25). (Despite confusion as to the judgment date, Mr. Huang apparently referred to the Furness judgment.[14])

Mr. Huang acknowledged that Taiwan opened its business at the 31 Suttons Lane location to, at least in part, market to customers of Victor, stating "[i]n one aspect, that's a chance for the business" (id. at T56–20 to 25). Frank Shen never advised any customers that Victor was shutting down (Shen, March 14, 2001 at T145–3 to 6). Mr. Shen did not know whether letters or memoranda were ever sent to customers of Victor advising them that the company was going to close (id. at T145–7 to 11).

Frank Shen testified that all employees (in addition to himself) who worked for Victor when it ceased operations late in 1998, began working for Taiwan Machinery in late 1998 or early 1999 when it started to operate at 31 Suttons Lane. These individuals are Zhene Dong, Ziye "Jay" Quian, Dawen Zhuo and Linda Cai (Shen, March 14, 2001 at T70–18 to T72–9, T73–7 to 9, and T75–6 to 76–18). At 31 Suttons Lane Taiwan Machinery used the same telephone number and facsimile number which Victor had used (Huang, June 21, 2001 at T56–10 to 16). Taiwan Machinery used the four or five telephones left behind by Victor (Shen, March 14, 2001 at T45–1 to 8). In fact, the only telephone number used by Taiwan Machinery in New Jersey was 732–572–7500 (defendant's answer to interrogatory 10(h)), Victor's old number. And, employees continued to answer the telephone as "Victor," not "Taiwan Machinery," after Victor had ostensibly closed its doors (Shen, March 14, 2001 at T67–2 to 23), while Taiwan Machinery might provide warranty service to customers of Victor (id. at T135–12 to 14 and T136–15 to 25), and sell its equipment (described only as "engines lathes and C & C machine" by Shen, id. at T145–16 to 21) so as to take advantage of its "chance for the business."

---

11. *See* PSE & G attached as Exhibit G to trustee's Affidavit in support of entry of default judgment filed on April 15, 2002.

12. Sixth Affirmative Defense incorporated into defendant's Answer to Complaint Affirmative Defenses Counterclaim and Jury Demand filed on June 12, 2000.

13. Defendant's answer to interrogatory 22, which requested the basis for the Sixth Affirmative Defense.

14. Proof of claim filed by Michael Davis, Esq., o/b/o Douglas Furness on January 18, 2001.

The defendant's *counsel* has on several occasions maintained that Taiwan Machinery was selling a "more advanced computer-generated type equipment" than presumably had been marketed by Victor (Stripp, April 20, 2001 at T9–19 to 20.) However, the defendant through counsel concedes that it sold "similar types of machinery" (document 63 at ¶ 2 line 8) to that of Victor (apparently seeking to distance itself from the Victor business by stressing the "more advanced" nature of the product).

Mr. Huang claims that he owns the trade name "Victor," and only he can authorize its use (Huang, April 20, 2000 at T15–9 to 14). He variously confirmed that only the companies which he owns which have "Victor" in the title, namely Victor Warehouse and Cargo, Victor Industrial, and Victor (i.e., Victor International) were permitted to use the Victor trade name/trademark (*id.* at T15–2 to 8 and T15–15 to 21), and also stated that "of course" Taiwan Machinery is allowed to use the Victor name (*id.* at T15–22 to 24 and T15–25 to T16–2). Neither Victor nor Taiwan Machinery paid Mr. Huang for the use of the Victor trade name/trademark (*id.* at T16–20 to 25). Defendant's answer to interrogatory 9(a) corroborates that Taiwan Machinery was one of four companies permitted to use the Victor name and the only one which did not bear "Victor" in its title (defendant's answer to interrogatory 9(a)).

Alen and Mary Huang owned the property at 31 Suttons Lane, Piscataway, New Jersey from which Victor and then Taiwan Machinery operated (Huang, April 20, 2002 at T41–4 to 9; June 21, 2001 at T26–21 to 25). Victor paid the Huangs rent, the last payment being $7,000.00 or less (Huang, April 20, 2000 at T41–10 to 12). The defendant produced a schedule of rent paid by Taiwan Machinery for the New Jersey facility.[15] The rent ledger shows that Taiwan Machinery paid $7,000.00 per month in rent for January 1999 through July 1999 and for January 2000 through May 2000, with no rent paid during the five-month gap between those periods and no rent paid after May 2000.

Based upon her review of invoices, the trustee attested that Taiwan Machinery was selling to customers of Victor, beginning some time before the entry of the Furness judgment of July 1998.[16] She identified thirty-two Victor customers to which Taiwan Machinery made sales before 1999.

The record shows casual substitution of addresses among the debtor, the defendant and their principals. Mr. Huang explained that tax returns of Victor bore the 3111 Via Mondo address of Taiwan Machinery because he and his family "lived there" and that Victor used a local (i.e., California) accountant (Huang, April 20, 2000 at T32–18 to 24). The proof of claim filed by Alen and Mary Huang on January 18, 2001 for $84,000.00 is based on eleven checks drawn payable to the debtor between July 7, 1998 and May 6, 1999. Two checks identified the drawer's address as being 32058 Pacific Drive, Rancho Palos Verdes, California, which Alen and Mary Huang list as their address on their proof of claim. The remaining nine checks identified the drawer's address as 3111 Via Mondo, Compton, California, the business

---

**15.** Unlabeled rent ledger attached to defendant's letter dated August 21, 2001 to the trustee, attached as Exhibit B to the trustee's certification in support of the cross motion to hold the defendant in contempt, filed on November 1, 2001.

**16.** Document 118, Affidavit of trustee in support of the entry of default judgment filed on April 15, 2002, paragraph 15 and Exhibit I.

address for Taiwan Machinery (*id.* at T32-18 to 20).

The tax returns of Victor disclose a precipitous drop in its assets and gross receipts after the Furness judgment was entered in July 1998 and after Taiwan Machinery arrived at 31 Suttons Lane, Piscataway, New Jersey. The trustee obtained the debtor's federal and state tax returns for three years (only after securing an April 2, 2001 court order which compelled C. Jim Chen, the debtor's accountant, to turn them over [17]). Mr. Chen attested that he had no other tax returns in his possession and that he had returned all supporting ledgers and documents to the taxpayer.[18] The address for Victor on each of these returns was 3111 Via Mondo, Compton, California and the corporate books were said to be in the care of Alen Huang at that address. The federal returns show the following:

### Victor International, Inc.

| | 1997 Return 7/01/97–6/30/98 | 1998 Return 7/01/98–6/30/99 | 1999 Return 7/01/99–2/29/00 |
|---|---|---|---|
| Assets | 231,465.00 | 22,413.00 | 8,674.00 |
| Gross receipts | 1,511,034.00 | 18,514.00 | 0.00 |
| Cost of goods sold | 1,239,274.00 | 16,833.00 | 0.00 |
| Total income | 273,450.00 | 5,610.00 | 0.00 |
| Total deductions | (488,348.00) | (488,384.00) | (9,590.00) |
| Taxable income | (214,898.00) | (482,774.00) | (9,590.00) |

In the year from July 1, 1998 through June 30, 1999 the debtor treated the unpaid Furness judgment as a business deduction; it was included in the "total deductions" of $488,384.00.[19]

The limited financial data provided by Taiwan Machinery showed the trustee the following:

### Taiwan Machinery Trade Center [20] (all locations)

| | 10/01/95–9/30/96 | 10/01/96–9/30/97 | 10/01/97–9/30/98 |
|---|---|---|---|
| Revenue | $2,637,957.00 | $3,388,533.00 | $6,030,886.00 |
| COGS | 1,864,301.00 | 2,456,290.00 | 4,526,295.00 |
| Total Exps. | 748,878.00 | 861,849.00 | 1,440,844.00 |
| Net Income | 33,311.00 | 75,364.00 | 74,449.00 |

17. Document 121.

18. Affidavit dated March 30, 2001 of C. Jim Chen, attached as Exhibit B to Document 121.

19. The defendant would argue that the debtor operated at a loss. Victor's returns show no taxable income in the last three years of its active life. However, the defendant cannot take solace in tax return losses incurred as the defendant was either about to embark or had already embarked upon its takeover of Victor's business. In particular, the 1998 return (year end 6/30/99) reported minimal sales, while suffering all operating expenses *and* the "paper loss" of the unpaid Furness judgment. As to earlier years, when the trustee requested the debtor's tax returns from IRS for 1994, 1995 and 1996, the IRS reported that none had been filed under the tax identification number for Victor. *See* Internal Revenue Service response to request dated June 26, 2001 from Andrea Dobin, Esq., trustee, attached as Exhibit C to Document 121.

20. Document 52, status report filed by the trustee on August 27, 2001, Exhibit E (all three pages).

Taiwan Machinery's New Jersey monthly sales reports informed the trustee of the following revenue:[21] in the year ending 9/30/99, New Jersey based sales totaled $1,580,729.67; and, the next year totaled $3,156,591.94.

### Findings—Fraudulent Conveyances

In sum, Taiwan Machinery simply took over its affiliate's business operations in New Jersey (and indeed, on the east coast), beginning during the pendency of the product liability suit, and on an accelerated basis following the entry of judgment in the state court of Michigan. The absorption of the debtor's business appears to have been ongoing through the end of 1998 and into 1999. That absorption, though challenged on occasion by the defendant with feeble distinctions such as its efforts to describe the Victor product line as "traditional" and the concededly "similar" Taiwan Machinery line as "more advanced," is evident to the court. The takeover was complete and is reflected in the quick loss in revenue of the debtor and, to the extent discernible, in the generally corresponding increase in the defendant's revenue. Taiwan Machinery's taking of the positive business attributes of Victor, under the circumstances of this case, carries with it badges of fraud which well justify fraudulent conveyance-based litigation; however, the defendant's disruption of the discovery process in that litigation has impaired the plaintiff in that process, and ultimately, in bringing this matter to trial. Such contumacious behavior of the defendant should not shield it from ultimate judgment where the badges of fraud are established. Thus, while the conventional default judgment prerequisites require plaintiffs to make out a *prima facie* case, certain intricacies of the fraudulent conveyance law if reasonably inferred from established facts, need not be more fully proven here. This case could therefore be distinguishable from others, such as those involving defaults based upon failure to plead, as to burden and extent of proofs required for judgment. Consider the interaction of Fed. R.Civ.P. 37(b)(2)(C) and 55(b)(2), bankruptcy counterparts at Fed. R. Bankr.P. 7037(b)(2)(C) and 7055, and D.N.J. LBR 7055–1(b).[22]

As a general rule, upon the entry of default against a defendant the factual allegations in the complaint are deemed to be true. *In re Villegas*, 132 B.R. 742, 746, n. 5 (9th Cir. BAP 1991) (citing *Geddes v. United Financial Group*, 559 F.2d 557,

---

21. Document 52, status report filed by the trustee on August 27, 2001, figures cited at page 3, paragraph 2.

22. *In re Lawrence*, 227 B.R. 907, 916–17 (Bankr.S.D.Fla.1998) addresses the point as follows: "When the Court reviews the evidence presented and determines that a litigant has engaged in willful and bad faith failure to meet his discovery obligations, the Court is empowered to impose sanctions in accordance with Rule 37(b) of the Federal Rules of Civil Procedure and Rule 7037(b) of the Federal Rules of Bankruptcy Procedure. Such sanctions include striking the Debtor's pleadings and entering a default judgment against the Debtor. Rule 37(b)(2) of the Fed-eral Rules of Civil Procedure and Rule 7037(b)(2) of the Federal Rules of Bankruptcy Procedure.... Accordingly, the facts alleged in the Trustee's Complaint ... are deemed to be established." [Citations omitted.] *See* note 6, *supra*, and cases cited in accompanying text. *See also National Hockey League, et al. v. Metropolitan Hockey Club, Inc., et. al.*, 427 U.S. 639, 642–43, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (the dismissal sanctions allowed under Fed.R.Civ.P. 37 must be truly available to the trial court, and their invocation should not be disturbed on review absent abuse of discretion, as both a general deterrent to noncompliance with discovery orders and a specific deterrent in a particular case).

560 (9th Cir.1977)). The moving party is also "entitled to all reasonable inferences from the evidence offered." *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir.1981). (The local rule, broadly applicable to all types of default, requires for entry of judgment an affidavit which "sets forth with specificity each element of at least one cause of action asserted" in the complaint along with "appropriate documentary evidence to support the allegations in the affidavit." D.N.J. LBR 7055–1(b)(2) and (3).) The court in its discretion determines whether the facts alleged constitute a valid cause of action. *Au Bon Pain*, 653 F.2d at 65. And, in its discretion, the court may, but is not required to, hold a hearing to establish damages. Fed. R.Civ.P. 55(b), through Fed. R. Bankr.P. 7055(b); *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir.1991), *cert. denied*, 503 U.S. 1006, 112 S.Ct. 1763, 118 L.Ed.2d 425 (1992) (affirming award of compensatory and punitive damages in excess of $2 million without an evidentiary hearing when the court had ample documentary evidence, testimony and knowledge of the case to support the damage award).

The trustee has established the asserted fraudulent conveyance causes under 11 U.S.C. § 548(a)(1)(A) and (B)(i) & (ii)(I), and 11 U.S.C. § 544(b) (which incorporates for purposes of plaintiff's complaint N.J.S.A. 25:2–25(a) & (b), and 27).

Regarding § 548(a)(1)(A), the record and the trustee's submissions in this case verify that the essence of the debtor's business was transferred to the defendant with actual intent to "hinder, delay or defraud" Furness in the collection of his judgment. What is clearly demonstrated in the record of this case is the absorption of Victor's entire business with essentially all of its operating apparatus, by its affiliate, Taiwan Machinery. The transfer oc-

curred over a period of time beginning somewhat before the judgment was entered and continuing through the end of 1998, and apparently into 1999. The "intent" standard is satisfied, though discovery and ultimate trial were resisted by the defendant through its contempt of the processes of this court.

"It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors. Therefore, as is the case under the common law of fraudulent conveyance, courts applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer.... Among the more common circumstantial indicia of fraudulent intent *at the time of the transfer* are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor...; (4) a special relationship between the debtor and the transferee, ....; and, *after the transfer*, (5) retention by the debtor of the property involved in the putative transfer ...."

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir.1991) (citations omitted, emphasis in original). The first four indicia of fraud are evident *sub judice*.

In the case at bar, the Furness product liability litigation, ongoing, spurred the informal absorption of the Victor business into Taiwan Machinery, thereby rendering the debtor without means or assets, while those with interests in both Victor and Taiwan Machinery benefitted from the transfer through their close and interlocking affiliation, a clear "special relationship." Taiwan Machinery left the shell of Victor behind, to deal with the liability side

of its balance sheet and the expenses of its last days. Given the presence of multiple badges of fraud, the court concludes that actual intent to defraud has been established. *See In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir.1994); *Kelly v. Armstrong (Armstrong III)*, 141 F.3d 799, 802 (8th Cir.1998); and *Kelly v. Armstrong (Armstrong IV)*, 206 F.3d 794, 801 (8th Cir.2000). *See, generally, Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 645 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992).

 It is emphasized that the completion of the transfer of the debtor's business to the defendant was "within one year before the date of the filing of the petition." § 548(a)(1). The absorption continued through the end of 1998, and there is evidence that it extended into 1999. *See* the Huang and Shen deposition testimony previously cited as to transition from debtor operations to defendant operations in this regard; defendant's answers to interrogatories 8(d), 10(a) & (b); and, the sales activity reflected on the debtor's tax re-turn for the year ending 6/30/99 and the no-receipts final return *filed thereafter* for the stub period from 7/1/99 through 2/29/00. The petition date was November 24, 1999. The statutory requirement is thus satisfied, even though the process of absorption began earlier during the pendency of the Furness litigation and before the entry of the Furness judgment on July 31, 1998.

Proof of transfer of specific debtor assets on specific dates (such as identifiable accounts receivable, inventory, equipment and other tangibles) has not been developed. Yet, out-of-the ordinary-course depletion of the debtors's assets, along with the elimination of sales (all as reflected in Victor's tax returns), and an apparent concomitant increase in the defendant's revenues (both generally and in New Jersey), is sufficient under the circumstances of this case to establish, through reasonable inference, wholesale transfers to Taiwan Machinery. The defendant simply denuded the debtor of its workplace, employees, customers, name and going-business attributes.[23] It is not unreasonable to conclude that, with the defendant in complete

---

**23.** The defendant's taking of the debtor's business appears to have effected a *de facto* merger. Under the general rule of successor liability a company which purchases or accepts transfer of all the assets of another company is not liable for the debts of the transferor. *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 271 (D.N.J.1994). An exception to the rule of non-liability occurs (1) if the parties have an express or implied agreement that the transferee will assume the liabilities of the transferor; (2) if the transferee were a " 'mere continuation' " of the transferor; (3) if there were a " 'de facto consolidation or merger' " of the companies; or (4) if the transfer were fraudulent. *Glynwed*, 869 F.Supp. at 271, citing Fletcher Cyc. Corp. § 7122 (Perm. Ed.1990). The elements of "mere continuation" and *de facto* consolidation tend to overlap. *Luxliner P.L. Export v. RDI Luxliner*, 13 F.3d 69, 73 (3d Cir.1993); *Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1534–35 (D.C.N.Y.1985). Courts consider four factors in deciding when a transaction satisfies either theory: "(i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (iii) assumption by the successor the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders." *Glynwed*, 869 F.Supp. at 275–76. All factors need not be present for the court to find mere continuation or *de facto* merger; the critical inquiry is whether the parties intended " 'to effectuate a merger or consolidation rather than a sale of assets.' " *Glynwed*, 869 F.Supp. at 276, citing *Luxliner*, 13 F.3d at 73 and *Menacho v. Adamson United Co.*, 420 F.Supp. 128, 133 (D.N.J. 1976). Under the merger theory, independent of orthodox proofs of fraudulent conveyancing, the merged or surviving entity, i.e.,

control and in the course of the raid by Taiwan Machinery on the business operation of Victor, inventory, accounts receivable, equipment and other Victor assets were confiscated by the defendant. Any opportunity to challenge such a conclusion was waived by the defendant when it decided to impede the progress of discovery reflecting on the overall finances of Taiwan Machinery.

The trustee has also satisfied the § 548(a)(1)(B)(i) standard (receipt of "less than a reasonably equivalent value in exchange" for the transfer), since it is established that Taiwan simply "took over." The debtor's business, and the assets which the court infers were transferred in the takeover by Taiwan Machinery, had a value which has not been specifically developed. However, the record does reflect specifics as to the precipitous decline of the debtor's balance sheet assets and gross receipts (and a corresponding increase in the defendant's gross receipts). There was no "reasonably equivalent value" given in exchange for everything-Victor. Similarly, the § 548(a)(1)(B)(ii)(I) proof that Victor was at the time of the transfer or was thereafter rendered insolvent, is evident. While Victor was a business generating over $1.5 million in sales in the year ending 6/30/98 and having stated assets in its tax return of $231,465 as of 6/30/98, the debtor was rendered lifeless by its affiliate's takeover (as evidenced by its tax

return of the next year showing sales of $18,514 and assets of $22,413, and the final return showing no sales, and minimal assets). The court concludes that property of substantial value was taken from Victor by the defendant, that there is simply no evidence of any "value" or "consideration" having been given by Taiwan Machinery to Victor for the takeover, and that the takeover rendered Victor insolvent. *See, generally, In re R.M.L., Inc.,* 92 F.3d 139, 148–53 (3d Cir.1996). The debtor was, indeed, "picked clean" by the absorption of its business into that of Taiwan Machinery without recompense by the transferee.

The analysis under the Uniform Fraudulent Transfer Act ("UFTA") as incorporated into the Bankruptcy Code under § 544(b) [24] is, of course, similar to that set forth above. Notably, the one-year time period which would limit § 548(a)(1)(A) and (B), is extended to include transfers within a period of limitations of at least four years. N.J.S.A. 25:2–31.

The function of the UFTA in New Jersey, N.J.S.A. 25:2–20 *et seq.,* as articulated by the New Jersey Supreme Court, is to keep a debtor from placing an asset beyond the reach of creditors. *Gilchinsky v. National Westminster Bank N.J.,* 159 N.J. 463, 475, 732 A.2d 482 (1999). The trustee has invoked liability under multiple sections of the UFTA. [25] The relevant inquiry is (1) whether the debtor has placed beyond the reach of

---

Taiwan Machinery, would be liable for all of the debts of each merging entity.

**24.** 11 U.S.C. § 544(b) allows the trustee to stand in the shoes of an actual creditor whose claim is allowed under § 502, or disallowed only under § 502(e). In order for the trustee to invoke this power, there must be an identifiable creditor with the capacity to bring an action under state law as of the petition date. *In re Bernstein,* 259 B.R. 555, 560 (Bankr. D.N.J.2001). Once the trustee undertakes the avoidance action, it is for the benefit of all creditors. *In re Cybergenics Corp.,* 226 F.3d

237, 243 (3d Cir.2000). *Sub judice,* the Furness claim, as well as the other unaffiliated claims, plainly empower the trustee under § 544(b).

**25. N.J.S.A. ANN. 25:2–25. Transfers fraudulent as to present and future creditors**

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

creditors an asset " 'which would have been available ... but for the conveyance' "; and (2) whether the debtor intended to "defraud, delay, or hinder the creditor" by transferring the asset. *Gilchinsky*, 159 N.J. at 475–76, 732 A.2d 482 (defendant's transfer of funds from a New York to a New Jersey retirement account held to be a fraudulent conveyance made with the intent to put assets beyond the reach of a judgment creditor), citing *In re Wolensky's Ltd. Partnership*, 163 B.R. 615, 626–27 (Bankr.D.C.1993). As in fraudulent conveyance actions brought under 11 U.S.C. § 548(a)(1)(A), state law recognizes that actual intent is difficult to prove but will be inferred from the existence of one or more "badges of fraud." *Gilchinsky*, 159 N.J. at 476–477, 732 A.2d 482, citing *Max Sugarman Funeral Home Inc.*, 926 F.2d at 1254–55. The state statute sets forth a list of non-exclusive indicia of fraud.[26]

*Sub judice*, both "actual intent" and a transfer "[w]ithout receiving a reasonably equivalent value in exchange" have been established. N.J.S.A. 25:2–25(a) & (b).

### Damages

 Ordinarily, the measure of damage for a fraudulent conveyance is recovery of the value of the transfer (or voiding of the transfer). 11 U.S.C. §§ 548(a) & 550(a) and N.J.S.A. § 25:2–30b. Here, proof of the value of the Taiwan Machinery appropriation of Victor assets has been befuddled by the defendant's bad faith in the discovery process. Therefore, as with proof of the elements of the fraudulent conveyance, it will be inferred that the value of the transfer is equivalent to no less than the sum of the net debt left behind when the defendant stripped Victor of its operating business.[27] *Cf. Acequia, Inc. v. Clinton*, 34 F.3d 800, 811–12 (9th Cir.1994). Or, conceiving of the damage measure somewhat differently, the *de facto*

---

a. With actual intent to hinder, delay, or defraud any creditor of the debtor; or

b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

**26. N.J.S.A. § 25:2–26. Factors in determining fraudulent intent**

In determining actual intent under subsection a. of R.S. 25:2–25 consideration may be given, among other factors, to whether:

a. The transfer or obligation was to an insider;

b. The debtor retained possession or control of the property transferred after the transfer

c. The transfer or obligation was disclosed or concealed;

d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e. The transfer was of substantially all the debtor's assets;

f. The debtor absconded;

g. The debtor removed or concealed assets;

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

**27.** In the § 548(a)(1)(B) context, consider the following going concern measure of "reasonably equivalent value": "when the debtor is a going concern and its realizable going concern value after the transaction is equal to or

merger of Victor and Taiwan Machinery would render the defendant liable for all claims against the debtor. *See* note 23, *supra.*

■ Note that the sanction amounts[28] are the defendant's direct responsibility. In addition, Taiwan Machinery is responsible for claims against the debtor's estate,[29] and for administrative expenses which its fraud has generated.[30] However, the defendant is entitled to a credit for those few assets it left behind with Victor, now in the hands of the trustee.[31]

The court shall this day enter judgment against the defendant in the amount of $373,607.[32]

exceeds its going concern value before the transaction, reasonably equivalent value has been received." *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 647 (3d Cir.1991).

28. These include: $4400 awarded at the January 24, 2002 hearing, and $3734.50 as a compensatory amount and $11,203.50 as a punitive sum, awarded at the March 14, 2002 hearing, totaling $19,338.

29. These include the Furness claim of $263,650.48, and that of the LLP for $15,300.94 totaling $278,951.42. The $84,000 claim of the Huangs is disallowed given their on-going position of control with the defendant. And, the purported claim of the defendant is disallowed (as originally filed and as amended to substitute Mary Huang, creditor).

30. Administrative claims have been certified as follows: accountant's fee, $3809; attorneys' fee, $72,321.40 (plus the $3734.50 awarded by the court); trustee's expenses, $283.78, and trustee commission of $22,363.32. Commission is calculated per 11 U.S.C. § 326(a), on a base of $382,266.32 comprised of:

| | |
|---|---|
| Furness Claim | $263,650.48 |
| LLP claim | 15,300.94 |

| | |
|---|---|
| Trustee's accountant's fee | 3,809.00 |
| Trustee's attorney's fee | 72,321.40 |
| Compensatory attorney's fee awarded March 14, 2002 | 3,734.50 |
| Funds in trustee's hands | 23,450.00 |
| | $382,266.32 |

The commission to be awarded shall be $22,363.32. The court has not included the penalty awards of $4400 and $11,203.50 in the base amount against which commission has been calculated.

31. This amount is $23,450.

32. To re-cap the judgment amount, it is comprised of the direct sanction amounts (including the $3734.50 for attorneys' fees) totaling *$19,338,* the unaffiliated claim total of $278,951.42, and the administrative claims totaling $98,777.50 (excluding the aforereferenced attorneys' fee), *less* the $23,450 in the hands of the trustee. That amount is: $373,607. Given the award of counsel fees and sanction amounts, no further costs, fees or interest need be assessed. Note that if the judgment should be collected, any excess in the hands of the trustee from sanctions or otherwise, beyond payment of all administrative expenses and the two unaffiliated claims, should be distributed to the unaffiliated claimants pursuant to 11 U.S.C. § 726(a)(5).